**Robert V. KRUEGER, Jr., Appellant,**

**v.**

**Richard E. LYNG, Individually and in his official capacity with the United States Department of Agriculture; Milton Hertz; Earle J. Badenbaugh; Vern Nepple; William Penn, individually and in their official capacities with the Agricultural Stabilization and Conservation Service; Morris Westfall; J.D.**

Everts; Billy Joe West; Larry Bock; Dan Jennings; and David Schwab, individually and in their official capacity with the Missouri State Agricultural Stabilization and Conservation Commission, Appellees.

No. 90–1598.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1990.

Decided March 11, 1991.

Mary Anne Sedey of St. Louis, Mo., for appellant.

Jennifer H. Zacks of Washington, D.C., for appellees.

Before BOWMAN and BEAM, Circuit Judges, and CONMY,[*] District Judge.

BOWMAN, Circuit Judge.

Plaintiff Robert V. Krueger, Jr. appeals from the order of the District Court[1] granting summary judgment for the defendants. The issue with which we deal is whether Krueger, a former employee of a county office of the Agricultural Stabilization and Conservation Service ("ASCS"), may maintain a *Bivens* action against the federal officials named as defendants. The District Court held that he may not. We reverse and remand.

I.

Krueger served as the County Executive Director ("CED") of Audrain County, Missouri, for the United States Department of Agriculture's ASCS from September 1983 until his termination in January 1987. While CED, Krueger discovered evidence of irregularities and abuses occurring in the operation of the Agriculture Department's farm price and conservation programs in Audrain County. He began to report these problems to Morris Westfall, the Missouri ASCS State Executive Director, in January 1984. Krueger alleges that initially Westfall and the State ASCS Committee tried to hinder further investi-

---

* The HONORABLE PATRICK A. CONMY, Chief Judge, United States District Court for the District of North Dakota, sitting by designation.

1. The opinion of the District Court is published as *Krueger v. Lyng,* 733 F.Supp. 75 (E.D.Mo. 1990).

gation of the irregularities, and that he repeatedly was discouraged from going public with his evidence. After Krueger bypassed the State Committee and brought his evidence to the attention of an auditor from the Office of the Inspector General ("OIG"), however, an audit was finally performed on the Audrain County ASCS Office in August 1984.

The results of the OIG audit, released in April 1986, substantially supported Krueger's claims of irregularities. The report also indicated that the irregularities had been corrected during Krueger's tenure as CED. In December 1986, Krueger was suspended by the State ASCS Office on charges that he intimidated employees under his supervision and failed to follow proper office procedures. After a hearing by the State Committee, Krueger was fired by the Committee. Krueger appealed his termination to the ASCS Deputy Administrator for State and County Operations, Earle Badenbaugh, who appointed a hearing examiner. After a three-day hearing, the hearing examiner recommended that Krueger's firing be upheld, and Badenbaugh adopted that recommendation.

Krueger then filed the present *Bivens* action, alleging that he had been discharged in violation of his first amendment rights in retaliation for his actions concerning the reporting of abuses occurring in Audrain County's ASCS office. He seeks damages and injunctive relief. The District Court granted the defendants' motion for summary judgment, holding that Krueger's *Bivens* claim was barred by "special factors" counselling against allowing such a claim. The District Court saw no indication that Congress inadvertently had failed to create a damages remedy for constitutional claims brought by ASCS county office employees like Krueger.

On appeal, Krueger raises three issues: 1) the District Court erred in holding that a *Bivens* action is unavailable; 2) injunctive relief is allowed in such an action; and 3) defendants are not entitled to qualified immunity.

## II.

The ASCS, a division of the Department of Agriculture, administers various Department programs including price support programs, agricultural conservation programs, and loan programs.[2] It was created by the Secretary of Agriculture ("the Secretary") pursuant to 16 U.S.C. § 590h(b) (1988), which requires the Secretary to establish state and local committees to administer these agricultural programs. The state committees are appointed by the Secretary, while the local "county committees" are elected by local farmers. 16 U.S.C. § 590h(b). The statute provides that the Secretary "shall make such regulations as are necessary relating to the selection and exercise of the functions of the respective committees, and to the administration, through such committees, of such programs." *Id.* One of the regulations issued by the Secretary pursuant to this delegated power directs the county committee to "[e]mploy the county executive director ['CED'] ... to serve at the pleasure of the county committee." 7 CFR § 7.21 (1987).[3] The CED is "responsible for the day-to-day operations of the county office" and executes the policies established by the county committee. 7 CFR § 7.26.

The CED may be suspended or fired by either the state or county committee, or by the Deputy Administrator, State and County Operations, of the Department of Agriculture ("Deputy Administrator"). 7 CFR §§ 7.29 & 7.30. The regulations issued by the Secretary provide a very limited remedy for the CED. A fired or suspended CED is to be given a written statement of the reasons for the adverse action, 7 CFR

---

**2.** According to the plaintiff's affidavit, in 1986 the Audrain County ASCS office administered over $3.5 million in direct payments to farmers and approximately $12 million in loans. Appellant's Appendix at 17. Nationwide, the ASCS disbursed between seven billion dollars and 25 billion dollars annually during 1982–1988. The

Government Accountability Project's Amicus Curiae Brief at 5.

**3.** CFR citations are to the 1987 regulations, the year that Krueger was fired. The relevant regulations, however, are virtually identical for the years 1986–90.

§§ 7.29 & 7.30, and if fired or suspended by the state or county committee, he may challenge that action. 7 CFR § 7.29. A CED fired or suspended by the county committee may appeal that decision to the state committee, whose decision or action in turn may be appealed to the Deputy Administrator. 7 CFR § 7.31. The CED may request that the Deputy Administrator reconsider his decision, *id.*, and is entitled to a hearing on any appeal or request for reconsideration filed with the Deputy Administrator. 7 CFR § 7.32. The hearing is to be conducted by the Deputy Administrator or a hearing examiner; it may include evidence and witnesses introduced by either party. *Id.* Both parties are entitled to cross-examine witnesses. *Id.* The hearing examiner is to transmit his findings and recommendations to the Deputy Administrator within sixty days from the receipt of the hearing transcript. 7 CFR § 7.33. Within thirty days of the receipt of this report, the Deputy Administrator is to make his final determination, which is not subject to further administrative review. 7 CFR § 7.34. There is no provision for any sort of judicial review.

### III.

The Supreme Court held in the eponymous *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), that a damages remedy is available to persons whose constitutional rights are violated by federal officials. The Court specified two exceptions to this rule: where Congress has provided an alternative remedy, *Bivens*, 403 U.S. at 397, 91 S.Ct. at 2005, or where there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Bivens*, 403 U.S. at 396, 91 S.Ct. at 2004.

The Supreme Court narrowed the availability of a *Bivens* action in *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). *Bush* was a case brought by a federal employee covered by the Civil Service Reform Act, 92 Stat. 1111 *et seq.* (its relevant parts codified, as amended, in various sections of 5 U.S.C.) (1988, as amended)

("CSRA"), which provides "comprehensive procedural and substantive provisions giving meaningful remedies against the United States." *Bush*, 462 U.S. at 368, 103 S.Ct. at 2406. The Court held that where there is "an elaborate remedial system [such as the CSRA] that has been constructed step by step, with careful attention to conflicting policy considerations ... a new judicial remedy for the constitutional violation at issue" should not be created. *Bush*, 462 U.S. at 388, 103 S.Ct. at 2416. In denying a *Bivens* action to federal employees covered by the CSRA, the Court assumed "that existing remedies do not provide complete relief for the plaintiff." *Id.*

In *Schweiker v. Chilicky*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), the Supreme Court further limited the availability of *Bivens* actions. The plaintiffs alleged that due process violations had resulted in the wrongful termination of their Social Security disability benefits. The Court first recognized that the Social Security system's administrative structure and procedures " 'are of a size and extent difficult to comprehend.' " *Chilicky*, 487 U.S. at 424, 108 S.Ct. at 2464 (quoting *Richardson v. Perales*, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426, 28 L.Ed.2d 842 (1971)). After describing the system's "elaborate administrative remedies," *Chilicky*, 487 U.S. at 424, 108 S.Ct. at 2468, the Court noted a claimant's statutory right to seek judicial review of his case, including any constitutional claims he may have, *id.*, and concluded that "Congress ... has not failed to provide meaningful safeguards or remedies." *Chilicky*, 487 U.S. at 425, 108 S.Ct. at 2468. Moreover, "Congressional attention [to the problem complained of by the plaintiffs] has ... been frequent and intense." *Id.* Because of this elaborate, complex remedial scheme deliberately designed and frequently modified by Congress, the Court held that a *Bivens* action did not lie. The Court again stated that a "special factor" precluding a *Bivens* action is the existence of a statutorily-created remedy, even though the remedy does not provide complete relief. *Chilicky*, 487 U.S.

at 423, 108 S.Ct. at 2467. Further, the Court noted that

> the concept of "special factors counselling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

*Id.*

We have previously noted these limitations, stating that

> [t]he result is a sort of presumption against judicial recognition of direct actions for violations of the Constitution by federal officials.... If Congress has not explicitly created such a right of action, and if it has created other remedies to vindicate (though less completely) the particular rights being asserted in a given case ... [then only] if Congress's omission to recognize a constitutional tort claim was "inadvertent" will the courts be free to allow such a claim.

*McIntosh v. Turner*, 861 F.2d 524, 526 (8th Cir.1988).

Here, the relevant statutory scheme created to provide constitutional tort remedies for federal employees is the CSRA. As noted earlier, a CED is hired by and serves at the pleasure of the elected ASCS county committee. This means that the CED is not a federal employee as defined by the CSRA,[4] and therefore does not have the benefit of the extensive remedies that this elaborate statute affords.[5] *See Hamlet v. United States*, 873 F.2d 1414, 1415 (Fed. Cir.1989) ("[t]he parties agree that [plaintiff's] employment status is not governed by the general civil service provisions of Title 5 and that she is not an 'employee' as defined in 5 U.S.C. § 2105").

Based on our reading of *Bush* and *Chilicky*, our decision in this case turns on two issues: 1) whether the limited administratively-created remedy available to ASCS county office employees (like Krueger) is sufficient to preclude a *Bivens* action; and if not, then 2) whether Congress's omission to recognize a constitutional tort claim for ASCS county office employees was "inadvertent."

## IV.

■ When determining whether an available remedy precludes a *Bivens* action, we must examine the relevant Congressional scheme. As a general proposition, it is Congress that sets the terms and conditions of federal employment. "Congress is the body charged with making the inevitable compromises required...." *Chilicky*, 487 U.S. at 429, 108 S.Ct. at 2470. For these purposes, then, administratively-

---

**4.** A federal employee is defined by the CSRA as someone

> (1) appointed in the civil service by one of the following acting in an official capacity—
> (A) the President;
> (B) a Member or Members of Congress, or the Congress;
> (C) a member of a uniformed service;
> (D) an individual who is an employee under this section;
> (E) the head of a Government controlled corporation; or
> (F) an adjutant general designated by the Secretary concerned under section 709(c) of title 32;
> (2) engaged in the performance of a Federal function under authority of law or an Executive act; and
> (3) subject to the supervision of an individual named by paragraph (1) of this subsection

while engaged in the performance of the duties of his position.

5 U.S.C. § 2105(a).

**5.** A CSRA-covered federal employee who is to be terminated is to be given 30 days' notice and has the right to question and respond to the basis for the termination. 5 U.S.C. § 7513(b)(1) & (2). He may be represented by an attorney and is to be given a written decision specifying the reasons for the termination. 5 U.S.C. § 7513(b)(3). The employee may appeal the agency's decision to the Merit Systems Protections Board ("MSPB"), 5 U.S.C. § 7513(d), which is required to conduct a trial-type hearing. 5 CFR § 1201.11 *et seq.* The MSPB's decision is appealable to the Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(a)(1) & (b)(1). The employee also has the right to ask the MSPB to review its initial decision. 5 CFR §§ 1201.114–1201.119.

created remedies are significant only to the extent they are developed pursuant to explicit statutory direction or guidance; we cannot evaluate the *Bivens* implications of an administrative remedial scheme without examining its statutory genesis.[6]

The statute creating the ASCS does not direct the Secretary of Agriculture to create a specific administrative scheme for overseeing the ASCS programs. Instead, the statute calls for the election of local county committees, and requires the Secretary to "make such regulations as are necessary relating to the selection and exercise of the functions of the respective committees, and to the administration, through such committees, of such programs." 16 U.S.C. § 590h(b). It is from this common[7] and very general enabling-statute language that the Secretary derives the power to create the administrative remedial scheme for ASCS county office employees described in part II of this opinion.

■ Only Congress has the power to decide that a statutory or administrative scheme will foreclose a *Bivens* action. *See generally, Chilicky*, 487 U.S. 412, 108 S.Ct. 2460; *Bush*, 462 U.S. 367, 103 S.Ct. 2404. To allow an administratively-created scheme to foreclose a *Bivens* action, without some real indication that Congress intended the administratively-created scheme to have that result, would require us to hold that the legislative power to foreclose a *Bivens* action has been delegated—a del-

egation almost certainly in violation of the separation of powers doctrine. *See Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 654, 102 L.Ed.2d 714 (1989) ("Congress generally cannot delegate its legislative power to another Branch.") (upholding the sentencing guidelines as constitutional).

We do not need to reach the constitutional question, however, for here it is clear that the general enabling language used in 16 U.S.C. § 590h(b) cannot be read to evince an intent by Congress to provide a separate (and less desirable) remedial scheme for ASCS county office employees. The statute authorizes the Secretary to issue such regulations as he deems necessary; it does not convey any intention by Congress to deal in any particular way with remedies for wronged ASCS county office employees, nor does it even suggest a policy decision about *Bivens* actions, upon which the Secretary might act. Congress has addressed federal employees (including Department of Agriculture employees) and the remedies available to them through the CSRA; no mention of this subject, either extending or denying CSRA coverage to ASCS county office employees, is made in either 16 U.S.C. § 590h(b) or the CSRA. It was solely the Secretary's decision, not Congress's, to have the local committees hire the CEDs, and it was this decision that resulted in the exclusion of such employees from coverage by the CSRA. We note that

---

**6.** Appellees assert that there is "no support ... for the arbitrary distinction between statutes and regulations," Appellees' Brief at 15, and cite *Bush* as support for its claim that a purely administratively-created remedial scheme can preclude a *Bivens* action. This reading of *Bush* is in error. Although the *Bush* Court does refer extensively to the regulatory remedies available, such remedies were evaluated in conjunction with the statutory schemes that spawned the regulations. *Bush*, 462 U.S. at 381–88, 103 S.Ct. at 2413–17. Further, the *Bush/Chilicky* rationale for limiting the availability of a *Bivens* action is grounded squarely on the principle that deference is to be given to the legislative branch's considered judgment concerning the remedies and protections that shall be available to the various classes of potential plaintiffs. *See Bush*, 462 U.S. at 380, 103 S.Ct. at 2412 ("We should therefore begin by considering whether there are reasons for allowing Congress to pre-

scribe the scope of relief that is made available....."); *id.* at 389, 103 S.Ct. at 2417 ("Congress is in a far better position than a court to evaluate the impact of a new species of litigation...."); *id.* at 390, 103 S.Ct. at 2417 ("[W]e are convinced that Congress is in a better position to decide whether or not the public interest would be served by creating" a new substantive legal liability.); *Chilicky*, 487 U.S. at 429, 108 S.Ct. at 2470–71 ("Congress is the body charged with making the inevitable compromises required.... Congress has discharged that responsibility to the extent that it affects the case before us, and we see no legal basis that would allow us to revise its decision.") (citation omitted).

**7.** A cursory check of the United States Code reveals many statutory grants of power using virtually identical language.

the remedy made available to Krueger by the Secretary is very limited, and indeed may even be characterized as "hollow," as the extent of his remedy is limited to appealing to the supervisor of those who fired him. If Congress intended this meager remedy to be Krueger's exclusive remedy, then his present action would be barred. We see no indication, however, of any such Congressional intent. Accordingly, the administratively-created remedy devised by the Secretary pursuant to the boiler-plate enabling language of 16 U.S.C. § 590h(b) does not foreclose Krueger's *Bivens* action.

## V.

■ Because it is clear that Krueger's limited administrative remedy is not the product of conscious Congressional design, we must determine whether the failure of Congress to provide a constitutional tort remedy for ASCS county office employees "has not been inadvertent." *Chilicky*, 487 U.S. at 423, 108 S.Ct. at 2468.

As noted earlier, the Secretary's power to create the ASCS county office positions comes from the standard enabling language of 16 U.S.C. § 590h(b). The same kind of language is used in numerous other statutes to give the Executive branch the power to hire federal employees. Thus, Congress's apparent intent in granting the Secretary such power was to allow him to hire employees in the manner similar to other Executive branch employees, and to have these employees subject to the same statutory protections. At the very least, the use of this enabling language indicates absolutely no intent to treat ASCS county office employees differently in any manner from other federal employees, or to exclude them from civil service protection. Thus, the exclusion of these ASCS county office employees from civil service coverage is an "inadvertent omission" by Congress. Congress did not direct, or in any way imply,

that these employees should be excluded from the CSRA;[8] their exclusion is solely the result of the Secretary's *sua sponte* decision to use a "non-traditional" hiring method. It is not a "non-inadvertent" act by Congress that excludes Krueger from civil service protection; instead, this exclusion results solely from the Secretary's having used standard enabling language as the basis for adopting an uncommon hiring practice.

An analysis of previous cases applying the *Chilicky* standard to *Bivens* actions brought by federal employees is further evidence that Congress's failure to provide ASCS county office employees with a constitutional tort remedy was inadvertent. Because of the way in which he was hired, Krueger is not considered an "employee" pursuant to 5 U.S.C. § 2105, and is neither expressly excluded from nor expressly covered by the CSRA. By contrast, in *Spagnola v. Mathis*, 859 F.2d 223 (D.C.Cir.1988), the two plaintiffs denied relief complained of a personnel action covered expressly by the CSRA, which applied to them. The plaintiffs denied relief in *McIntosh*, 861 F.2d 524 (8th Cir.1988), were covered by the CSRA, as was the plaintiff in *Hill v. Dep't of Air Force*, 884 F.2d 1318 (10th Cir.1989), and in *Karamanos v. Egger*, 882 F.2d 447 (9th Cir.1989). *Maxey v. Kadrovach*, 890 F.2d 73 (8th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 2176, 109 L.Ed.2d 505 (1990), involved a Section 2105 employee who was excluded expressly from the CSRA protections generally afforded federal employees, as did *Stephens v. Dep't of Health and Human Serv.*, 901 F.2d 1571 (11th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 555, 112 L.Ed.2d 562 (1990), *Lombardi v. Small Business Admin.*, 889 F.2d 959 (10th Cir.1989), *Brothers v. Custis*, 886 F.2d 1282 (10th Cir.1989), *Feit v. Ward*, 886 F.2d 848 (7th Cir.1989), and *Ko-*

---

**8.** It is inappropriate to view the annual farm appropriations bills passed by Congress as implicit approval of the exclusion of ASCS employees from the civil service. It was not until 1989 that a federal court recognized that ASCS county office employees are not covered by the

CSRA. *See Hamlet v. United States,* 873 F.2d 1414, 1415 (Fed.Cir.1989). Thus, Congressional inactivity on this matter can be viewed only after 1989. This is not a pattern of repeated inactivity that can be translated into a conscious decision or implicit approval.

*tarski v. Cooper,* 866 F.2d 311 (9th Cir. 1989).[9] All of these cases ruling out *Bivens* actions deal with Section 2105 federal employees whose employment classification is either expressly excluded from or included in the general CSRA provisions; Krueger, on the other hand, because of the method chosen by the Secretary for his hiring, is not a Section 2105 employee and is a federal employee whose classification is neither included in nor expressly excluded from CSRA coverage. In short, Congress has not provided any remedial provisions whatsoever for ASCS county office employees like Krueger.

The Supreme Court first recognized the "inadvertence exception" to the presumption against *Bivens* actions in *Chilicky,* 487 U.S. at 423, 108 S.Ct. at 2467. The courts have continued to note this exception.[10] If the case at hand cannot be said to be an "inadvertence" case, then as a practical matter there is no such exception. Surely, though, the language of *Chilicky* was intended to have meaning. Despite the government's strenuous arguments to the contrary, it simply is not true that Congress has authorized a comprehensive scheme governing claims arising out of

ASCS county office employment. Rather, it seems plain to us that such employees were eliminated from civil service coverage, and relegated to a much less desirable scheme fashioned by the Secretary, by administrative decisions neither the fact of which nor the consequences of which did Congress foresee. It also seems plain to us that Congress never has given a moment's thought to the question of what sort of remedies should be available to ASCS county office employees like Krueger.[11] We therefore hold that Congress's failure to provide a remedy for constitutional wrongs suffered by ASCS county office employees has been inadvertent. Krueger thus may proceed with his *Bivens* action.

## VI.

Because the District Court held that a *Bivens* action was not available to Krueger, it did not reach the issues of whether injunctive relief is available and whether the defendants are entitled to qualified immunity. We decline to consider these issues before they have been addressed by the District Court. Accordingly, we reverse the order of the District Court granting summary judgment for the defendants

---

9. Although not all of these opinions expressly note the status of the employee in question, a review of the relevant statutory and regulatory provisions will so indicate.

10. *See Maxey,* 890 F.2d at 75; *Lombardi,* 889 F.2d at 961; *Brothers,* 886 F.2d at 1284; *Feit,* 886 F.2d at 853; *Hill,* 884 F.2d at 1320; *Karamanos,* 882 F.2d at 452; *Kotarski,* 866 F.2d at 312; *McIntosh,* 861 F.2d at 526; *Spagnola,* 859 F.2d at 229; *see also Cale v. Johnson,* 861 F.2d 943, 946 (6th Cir.1988).

11. No provision in the CSRA deals with ASCS county office employees; further, we are not aware of any discussion of such employees in the legislative history of the CSRA. There is ample evidence, however, indicating Congress's intent to protect government whistleblowers such as Krueger. As a prelude to passage of the CSRA, a congressional study stated that "[t]he code of silence thwarts . . . management's ability to effectively manage and actually removes the burden of accountability from their shoulders. . . . Fear of reprisal renders intra-agency communication a sham, and compromises not only the employee, management, and the Code

of Ethics, but also the Constitutional function of congressional oversight itself." Staff of Senate Comm. on Governmental Affairs, 95th Cong., 2d Sess., *The Whistleblowers: A Report on Federal Employees who Disclose Acts of Governmental Waste, Abuse and Corruption* 49 (Comm.Print 1978). "What is needed is a means to protect the Pentagon employee who discloses billions of dollars in cost overruns, the GSA employee who discloses widespread fraud, and the nuclear engineer who questions the safety of certain nuclear plants." S.Rep. No. 969, 95th Cong., 2d Sess. 8, *reprinted in* 1978 U.S.Code Cong. & Admin. News 2723, 2730. In contemplation of the passage of the Whistleblower Protection Act of 1989, Pub.L. No. 101–12, 103 Stat. 16 (codified in scattered sections of 5 U.S.C.A. and 22 U.S. C.A. (West Supp.1990)), Senator Roth noted the "massive . . . problem of Government waste and fraud" that needs "Federal workers to . . . report any wrongdoing that they observe." However, he stated that "we are fooling ourselves if we believe that this can occur without having adequate protections in place that will protect those employees who risk their jobs and career to expose the problems of waste and fraud in Government." 134 Cong.Rec. 29544 (1988).

and remand the case for further proceedings consistent with this opinion.