Noreen **BISHOP**, Plaintiff,

v.

**ALBERTSON'S, INC.,** Defendant.

No. CS–90–203–RJM.

United States District Court,
E.D. Washington.

Nov. 16, 1992.

Kenneth M. Hopkins and Floyd F. Fulle, Seattle, Wash., for Noreen Bishop.

Peter M. Anderson, Bogle & Gates, Seattle, Wash., for Albertson's, Inc.

## AMENDED MEMORANDUM

ROBERT J. McNICHOLS, District Judge.

The memorandum which follows was initially entered on April 19, 1991. Trial judges on occasion are tempted to publish dated opinions when authority later issues supporting their views; *viz.*, the I-wrote-it-first syndrome. Publication in this case has been prompted by a quite contrary consideration. Research in connection with another case revealed *Lamprecht v. F.C.C.*, 958 F.2d 382 (D.C.Cir.1992). *Lamprecht* establishes conclusively that footnote 4 herein is dead wrong. It was not in April of 1991, but it is now. Some might question burdening the Federal Supplement with material known to be flawed, but the purpose of doing so should become apparent in due course.

Whatever one might think of the merits of the controversy swirling around Justice Thomas and his confirmation hearing, few fair-minded observers would disagree with the proposition that the circus atmosphere cheapened the process by which individuals are selected to serve as the final arbiters of the law. Beyond the process itself, some of the participants therein, and the Supreme Court as an institution, there was yet another casualty.

Among the potholes in the road to confirmation was then-Judge Thomas' involvement in a controversial and emotionally charged appeal challenging FCC policy in favoring female applicants for broadcast licenses. The policy would ultimately be struck down on equal protection grounds. *Lamprecht, supra.* The merits of the decision are of no moment to this discussion, but the procedure which attended it is. The case was argued in January of 1991 and remained under submission during the confirmation hearing. Chief Judge Mikva and Judges Thomas and Buckley already knew what the outcome would be and preliminary drafts of the disposition had been circulated among the members of the panel. In keeping with standard practice, no one else outside of the three judges' immediate staff should have known.

Suddenly, everyone knew when the press reported, with stunning accuracy, what the ruling would be and that Judge Thomas would author it. Judge Buckley makes no bones about who leaked the preliminary drafts. It was one of the twelve law clerks working for the panel members. 958 F.2d at 403 (Buckley, J., concurring). Not only were the drafts released but an unnamed source employed by the Court opined that the decision was being "delayed by Judge Thomas so as not to imperil his nomination." *The New York Times*, Feb. 20, 1992, Section A; Page 1; Column 1. The nomination was already in trouble for reasons too widely publicized to bear reiteration. That Judge Thomas would put his suspected anti-affirmative action views into practice in *Lamprecht* would not help him in some circles. The accusation that he might delay releasing the opinion to serve political ends was even more damaging.

The scope of possible culprits expanded geometrically when it developed that one of Judge Thomas' law clerks distributed the preliminary drafts to the chambers of other circuit judges not on the panel. *The New York Times*, Feb. 21, 1992, Section A; Page 12: Column 5. From there, of course, the drafts could have been further disseminated by any number of individuals affiliated with the D.C. Circuit.

Judge Buckley describes such leakage as a "willful breach of trust" which "cast[s] a shadow" over every law clerk privy to the drafts. 958 F.2d at 403. So it is, and so it does. The leak could not have been motivated by a well-meaning but empty-headed desire to enlighten the public as to what the law was or would be. The

motive, rather, could only have been to defeat Judge Thomas' nomination. Judge Buckley goes nowhere near far enough in his characterization or condemnation. A law clerk who employs his or her unique privity with the judicial process in an effort to subvert the political process violates the most sacrosanct of canons and is guilty of nothing less than official corruption:

> The relationship between judge and law clerk is essentially a confidential one. A law clerk should abstain from public comment about a pending or impending proceeding in the court in which the law clerk serves. A law clerk should never disclose to any person any confidential information received in the course of the law clerk's duties, nor should the law clerk employ such information for personal gain.

Code of Conduct for Law Clerks, Canon 3(C), *reprinted in*, Rubin & Bartell, *Law Clerk Handbook* at Appendix A (Federal Judicial Center rev. ed. 1989) [hereafter *Handbook*].

So viewed, footnote 4 is wrong. With confidence that this sorry episode is an example of the exception proving the rule, the following nineteen-month-old memorandum will be dusted off and submitted for publication.

\* \* \* \* \* \*

■ This is an employment discrimination action in which Ms. Bishop alleges that Albertson's, a multi-state grocery chain, failed to make reasonable efforts to accommodate her handicap. On April 10, 1991 the Court denied defendant's motion for summary judgment. An interesting oral motion followed which was argued telephonically on April 12, 1991.

The law clerk assisting the Court on the summary judgment motion was Keller Allen. Between 1979 and 1985, and prior to becoming an attorney, Mr. Allen was employed by the union to which Ms. Bishop belongs. The final three years were spent as the union's grievance director. He left that position in 1985 to continue his education and was thereafter hired as a law clerk by the undersigned in 1989. After the summary judgment hearing, Albert-son's learned that Mr. Allen represented Ms. Bishop in a grievance proceeding in 1984 and now suggests that as a result of that relationship he may entertain preconceived notions about the merits of the instant action, and suggests further that such bias may have infected the disposition of the motion.

Mr. Allen advises that there were approximately 7,500 union members in his jurisdiction during the relevant time frame and that he processed several hundred grievances each year. He does not recall representing Ms. Bishop. Plaintiff's counsel advises that his client does not remember my law clerk either. Mr. Allen concedes that if the employer's records reflect his involvement some seven years ago, it must have occurred, but he has no recollection of the events. That representation pretty much ends the inquiry so far as the Court is concerned.

The perception of impartiality is as important as its fact. *Preston v. United States*, 923 F.2d 731, 734–35 (9th Cir.1991). Accordingly, the Court has once again reviewed the file and sua sponte reconsidered the merits of the motion. That will be addressed further. First, however, because Mr. Allen takes offense at the suggestion that his integrity is anything less than what both he and the Court know it to be, a few words about law clerks.

The duties of a law clerk are undefined by statute or otherwise. *Fredonia Broadcasting Corp., Inc v. RCA Corp.*, 569 F.2d 251, 255–56 (5th Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978), *disavowed on other grounds, Riquelme Valdes v. Leisure Resource Group, Inc.*, 810 F.2d 1345, 1349 n. 2 (5th Cir.1987). Unlike other players in the judicial arena who are deemed adjuncts of the Court, such as magistrates and bankruptcy judges, and who exercise authority in their own right, a law clerk is essentially an extension of his judge. *Oliva v. Heller*, 670 F.Supp. 523, 526 (S.D.N.Y.1987), *aff'd*, 839 F.2d 37 (2nd Cir.1988).

Each judge has his or her own concept of what a law clerk is and does. Some squander talent by relegating clerks to mundane

clerical tasks. Proceedings of the American Bar Association 93rd Annual Meeting, *Improving Procedures in the Decisional Process*, 52 F.R.D. 51, 68–69 (1973) [hereafter *Decisional Process*]. Some lean too far the other direction by delegating non-delegable judicial duties. *Dixon v. City of Lawton*, 898 F.2d 1443, 1446–47 (10th Cir. 1990) (law clerk settled jury instructions); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1523–24 (11th Cir.1988) (law clerk presided over hearing), *cert. denied*, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989); *United States v. Sloan*, 811 F.2d 1359, 1361 n. 2 (10th Cir.1987) (law clerk settled instructions *in criminal case*).

The term "law clerk" is a holdover from days of yore when there was far less law on the books and travel more difficult. The clerk served as the judge's secretary, bailiff, scrivener, administrative assistant, and depending upon the personal wishes of the judge, his bodyguard, chauffeur, and man-Friday. See Baier, *The Law Clerks: Profile of an Institution*, 26 *Vand.L.Rev.* 1125, 1149–50 (1973) [hereafter Baier]. While those same duties still exist to one extent or another, the explosion of legal authority and sheer volume of paperwork attendant to modern practice now focus a law clerk's function on his ability to act as a sieve for the flow of information by distilling reams of briefing and documentation into those facts which are relevant and by extracting those legal authorities which are germane to the issues presented. *Handbook, supra,* at ch. 5, § 1; Baier, *supra,* at 1163–71; *see generally,* Federal Judicial Center; *Seminars for Circuit Court Judges,* 63 F.R.D. 453, 465 *et seq.* (1974).

When the adversarial process breaks down (as unhappily it sometimes does), it is the law clerk who assists the Court in defining issues and locating authorities which have eluded counsel. See Ubell, *Report on Central Staff Attorneys' Offices in the United States Courts of Appeals,* 87 F.R.D. 253, 258 (1980). If the law clerk is fortunate and the judge wise, the clerk will also be utilized as a sounding board and devil's advocate in the decision-making process.[1] *Oliva, supra,* 839 F.2d at 40); *Hall v. Small Business Administration,* 695 F.2d 175, 179 (5th Cir.1983); *Fredonia, supra,* 569 F.2d at 255–56; *Handbook, supra,* at ch. 2, § 2.

Issues are developed, alternative analyses framed, and dispositions proposed. It is the judge who makes decisions, not his staff. *In re Allied–Signal, Inc.,* 891 F.2d 967, 970–71 (1st Cir.1989); *Parker, supra,* 855 F.2d at 1523–25; *Dobson v. Camden,* 502 F.Supp. 679, 680 (S.D.Tex.1980). But at the same time a judge must repose great confidence in the abilities and integrity of his clerk, because the misfeeding of facts or authorities, whether through negligence or design, could have an outcome-determinative effect. See Fite, Potts & Sweeney, *Law Clerkships—Three Inside Views,* 33 *Ala. Lawyer* 155, 167–68 (1972).

Not so very long ago, law clerks typically held their positions for only a one or two year period. Baier, *supra,* at 1141. Fresh out of law school, they would rotate in and out and a new face would appear annually. This was good experience for the law clerk, but not particularly helpful to the system. By the time a clerk became sufficiently familiar with the mechanics of the task at hand to be productive, he or she would move on. *Id.* at 1142.

Career law clerks were a rarity until relatively recently. The term "career law clerk" was in fact unknown in the Article III context until coined by the Judicial Conference in 1985.[2] Now, the practice is growing and salaries have dramatically increased in order to attract qualified individuals willing to commit to the long haul.

---

1. Law clerks sometimes have other, perhaps more intriguing duties. *Starshock, Inc. v. Shusted,* 370 F.Supp. 506, 507–08 (D.N.J.) (law clerks commissioned as special fact finders to view allegedly obscene nude dancing), *rev'd* 493 F.2d 1401 (3rd Cir.1974). For a compendium of decisions addressing similar fact-finding missions, most of which proved ill-advised, see

*Price Bros. Co. v. Philadelphia Gear Corp.,* 629 F.2d 444, 446 (6th Cir.1980).

2. Although the practice was apparently common in some Article I courts. *Mareno v. Re,* 568 F.Supp. 17, 20–21 (S.D.N.Y.), *aff'd,* 742 F.2d 1430 (2nd Cir.1983) (table), *cert. denied,* 465 U.S. 1008, 104 S.Ct. 1004, 79 L.Ed.2d 236 (1984).

When the undersigned's career clerk came on board in 1982, the salary level was capped at JSP 13 and achieving that grade required five years of service. In 1986, seniority requirements were relaxed. In 1989 the cap was increased to JSP 14. Effective January 1991, a law clerk with sufficient seniority can rise to JSP 16. This progression of promotions was accomplished out of recognition that the existing complement of Article III judges cannot conceivably meet the ever expanding workload without adequate support staffing.

This shift was not undertaken lightly, nor was it undertaken without recognition that the system daily walks a tightrope. It is important that law clerks not be carried away with delusions of authority they do not have. It is important that litigants appreciate that decisions are made by a constitutional judicial officer.[3] It is important that judges not feel their discretion has in any sense been delegated or their judgment impaired by soliciting and considering input from their clerks. See *Decisional Process, supra*, 52 F.R.D. at 76–78 (addressing the seductive lure of delegation and the dangers thereof). Efficiency and speed of disposition in the adjudicative process are worthwhile goals, to be sure, but the system can never lose sight of the fact that Article III imposes limits not meant to be broken or winked at. *Geras v. Lafayette Display Fixtures, Inc.*, 742 F.2d 1037, 1046 (7th Cir.1984) (Posner, J. dissenting).

The undersigned selects his clerks with care. Scholastic ability has its place, but the focus is on maturity and judgment. The Court prefers people who have been around the barn once or twice, and who know what is out there behind the barn. Of the ten clerks the Court has employed over the past twelve years, each has displayed discrete strengths and weaknesses, but there has not been a bad one in the bunch. All have been conscientious in their work habits, unflagging in their devotion to expedition of the Court's calendar, and thoroughly honorable in their approach to ethical considerations.

■ Lawyers who practice in this district are bound only by the Rules of Professional Conduct. Local Rule 1.2(f)(2). Law clerks are bound not only by the RPC, but the Code of Judicial Conduct and the even more stringent Code of Conduct for Law Clerks as well. See *Hunt v. American Bank & Trust Co. of Baton Rouge*, 783 F.2d 1011, 1015 (11th Cir.1986) (all which is forbidden to a judge is forbidden to the clerk); *In re San Juan Dupont Plaza Hotel Fire Lit.*, 129 F.R.D. 409, 411–12 (D.Puerto Rico 1989) and authorities cited therein (same). As if strict compliance with the various written codes were not enough, the typical law clerk will also feel bound by his judge's personal code of ethical behavior.

Honesty is paramount. A law clerk knows for the most part what his judge knows: how motions will be decided, what findings will be entered, and how much in damages will be awarded. Crump, *How Judges Use Their Law Clerks*, 58 *N.Y. St. B.J.*, 43, 48 (May 1986) [hereafter Crump]. They know these things well before the litigants do, and more to the point, before the stock market closes. In the criminal arena, they know what evidence will be suppressed, whose telephone is being tapped, and who is going to jail and for how long. Drug dealers would pay good money for such advance information. Law clerks are privy to sealed material in a variety of contexts and routinely have access to both valuable trade secrets and ongoing criminal investigations. It does not take a wealth of imagination to appreciate that a corrupt law clerk could retire young.[4]

---

3. Unfortunately, some judges in their zeal to confer credit for work well done manage to foster a contrary perception. *Acceptance Ins. Co. v. Schafner*, 651 F.Supp. 776, 778 (N.D.Ala. 1986) ("This Memorandum of Opinion was prepared by William G. Sommerville, III, Law Clerk, *in which the Court fully concurs.*") (emphasis added); *see generally, Parker, supra*, 855 F.2d at 1524.

4. It is amazing the system works. Judges, magistrates, U.S. Attorneys and their assistants, and law enforcement personnel all undergo rigorous FBI background checks prior to being entrusted with such sensitive information. Law clerks, like Li'l Abner, merely swear to do good and avoid evil. The case law reflects occasional lapses of judgment. *See, e.g., In re Corrugated*

Law clerks are impartial. That is not to say that each does not have his or her own unique perceptions and values based on life experience. As is the situation with judges, proof that a law clerk's mind "was a complete *tabula rasa* ... would be evidence of lack of qualification, not lack of bias." *Laird v. Tatum,* 409 U.S. 824, 835, 93 S.Ct. 7, 14, 34 L.Ed.2d 50 (1972) (per Rehnquist, J.). Nor is it to say that a law clerk cannot be partisan in the sense that he or she might vigorously contend for a favored result based on a construction of fact or law. Crump, *supra,* at 44–45. But law clerks do not favor parties or classes of parties. One who did would rapidly lose credibility and the confidence of the Court.

On those occasions when a clerk has faced a conflict, he or she has been quick to either sua sponte decline to work on a case, or if the conflict is fuzzy, raise the question with the undersigned. The facts at bar do not deviate from such well established practice. The events which gave rise to this suit did not culminate until 1987, long after Mr. Allen left his position with the union. Mr. Allen had no recollection of his connection with Ms. Bishop at the time of working on the motion, and as this is written, has no independent recollection now of processing her grievance.[5]

Having laid the groundwork, this memorandum will come to the point. Mr. Allen is troubled by the slur on his integrity. The Court is troubled by the implicit slur on its judgment. The Court is further troubled by the inference that the motion was not decided by an Article III judge. It was.

Lest counsel be forced into accepting an *ipse dixit* statement, the mechanics of the process will be set out. A tentative draft of the calendar for a given week is pro-duced on Monday or Tuesday of the preceding week. The calendar is divided between the law clerks and each "works up" his respective files. Friday is briefing day. The Court meets with the clerks and motions, trials and other matters scheduled for the following week are discussed in as much detail as each requires.

A motion which is cut and dried may merit no more than an oral debriefing. A motion which is more complex but the outcome of which seems apparent is accompanied by a rough draft proposed disposition. A motion which is complex and the outcome of which does not seem apparent is accompanied by a bench memo analyzing the strengths and weaknesses of the parties' respective positions.

The Court tries to set aside Friday afternoons as "quiet time" for the purpose of reviewing the files and the clerks' work product. That approach is usually not altogether successful and any materials not digested by the close of Friday are either reviewed on Saturday or brought home for the weekend. Whatever the procedure in relation to a given motion, counsel may appear at the hearing and argue with confidence that the Court has reviewed the file and done so with benefit of an objective analysis prepared by the staff.

Motions of any complexity are typically taken under advisement at which point the facts and applicable law are once again hashed and thrashed. Once the undersigned is convinced that further research and reflection would not alter the result, a decision is made and a written disposition entered. When counsel read that disposition, they may do so with confidence that it is not a rubber stamped version of what the law clerk thinks. Rather, it is the result of a judicial act.

---

*Container Antitrust Lit.,* 614 F.2d 958, 967–68 (5th Cir.), *cert. denied,* 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980); *Miller Indus. v. Caterpillar Tractor Co.,* 516 F.Supp. 84, 88–89 (S.D.Ala.1980) and authorities cited therein. But the Court is aware of no published decision involving the commission of a corrupt act by a law clerk. That is a better record than judges have.

**5.** As must a judge, a law clerk is under an obligation to make reasonable inquiry to deter-mine whether a conflict exists. *Parker, supra,* 855 F.2d at 1525. If the members of Mr. Allen's prior employer were a contentious lot who routinely filed grievances at the drop of a hat, this would be a different case. With only several hundred grievances filed yearly and a complement of 7,500 individuals, the mere fact of Ms. Bishop's union membership does not give rise to any presumption that she must have filed a grievance during Mr. Allen's three-year tenure as grievance director.

The foregoing has been set out in some detail because of the importance of litigants appreciating that they have received the process to which the Constitution entitles them. Defense counsel may assure his client that the employer was not short-changed in this regard.

Having again reviewed the file, the Court finds no reason to deviate from the disposition now in place. This case is rife with issues of fact. Plaintiff may or may not have met the threshold requirements to be a scan coordinator and may or may not have been by-passed in favor of persons with lesser qualifications. A scan coordinator may or may not have been considered a management-entry position. There may or may not have been courtesy booth openings available which plaintiff may or may not have seriously considered accepting. Albertson's may or may not allow employee transfers between Spokane and Seattle.[6] Considering these issues alone (out of the plethora which could be chronicled) in light of the strong presumption that reasonable accommodation is virtually always a question of fact,[7] leaves the Court convinced beyond doubt that granting the motion would mean a quick round trip to San Francisco and back.

The case has been reassigned to another law clerk. This is not being done because of any improper conduct on the part of Mr. Allen, but because now that his former relationship with plaintiff has surfaced, he would be the first to agree that his continued involvement would be inappropriate.

---

**6.** Albertson's urges that the focus should be only on its Inland Empire Division headquartered at Spokane, Washington. So viewed, the employer would have no duty to attempt to place plaintiff outside of the Spokane area. On the other hand, in removing this action from state court Albertson's asserted that its principal place of business is Boise, Idaho. There is something vaguely inconsistent about these two positions. The parties have raised no jurisdictional issue vis a vis diversity and the Court will proceed on the premise that the employer is domiciled in Idaho for purposes of 28 U.S.C. § 1332(c)(1). *See generally, Industrial Tectonics, Inc. v. Aero Alloy,* 912 F.2d 1090, 1094 (9th Cir.1990) ("nerve center" test applies when corporate activity does not predominate in any one state). However, counsel may wish to address why Albertson's should be viewed as a unitary corporate entity for jurisdictional purposes and yet be broken down into discrete managerial divisions for purposes of weighing the merits.

**7.** *Kimbro v. Atlantic Richfield Co.,* 889 F.2d 869, 877–78 (9th Cir.1989) (construing Washington law), *cert. denied,* — U.S. —, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990).