**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3210

_____

David A. Duffy,                              *
                                             *
        Appellant,                  *
                                             *   Appeal from the United States
    v.                               *   District Court for the
                                             *   Southern District of Iowa.
Charles R. Wolle; Harold D. Vietor;          *
Ronald Longstaff, Sued as Ronald E.          *
Longstaff,                                   *
                                             *
        Appellees.                  *

_____

Submitted: March 13, 1997
Filed: August 19, 1997

_____

Before WOLLMAN and MAGILL,[1] Circuit Judges, and GOLDBERG,[2] Judge.

_____

MAGILL, Circuit Judge.

David Duffy sought to be appointed to the position of Chief United States Probation Officer (CUSPO) for the United States District Court for the Southern District of Iowa. A panel of three United States District Judges for

_____

[1]The Honorable Frank J. Magill was an active judge at the time this case was submitted and assumed senior status on April 1, 1997, before the opinion was filed.

[2]THE HONORABLE RICHARD W. GOLDBERG, Judge, United States Court of International Trade, sitting by designation.

the Southern

District of Iowa, comprised of Chief Judge Charles R. Wolle, Judge Harold D. Vietor, and Judge Ronald E. Longstaff (Panel), appointed a female applicant to the CUSPO position. Because the Panel did not appoint him, Duffy subsequently brought this Bivens action against the Panel, alleging a Fifth Amendment due process violation for the denial of equal protection through the practice of reverse discrimination.  The district court[3] granted summary judgment to the Panel, and Duffy now appeals.  We affirm.

## I.

On April 29, 1994, Edwin Ailts resigned from the CUSPO position for the United States District Court for the Southern District of Iowa.  Ailts had served as a probation officer since 1963 and as the CUSPO for the Southern District of Iowa since 1974.  Although Ailts tendered his formal resignation on December 7, 1993, he had notified the Panel during the Fall of 1993 of his intention to resign.

The Panel had the statutory authority to appoint a successor to Ailts to fill the CUSPO position in the Southern District of Iowa.  See 18 U.S.C. § 3602.  On September 30 and October 1, 1993, Chief Judge Wolle attended a conference in Washington, D.C., presented by the Administrative Office of the United States Courts. While at the conference, Chief Judge Wolle states that he

---

[3]The Honorable William G. Cambridge, Chief Judge, United States District Court for the District of Nebraska.

was informed that when [the Panel] needed to select a replacement for Edwin Ailts, our chief probation officer, [the Panel] should advertise the position in a publication of national circulation to reach all persons who might be interested so [the Panel] could have an open, nationwide, diverse pool of qualified applicants.

Wolle Aff. (Apr. 30, 1996) at 1-2, ¶ 2, reprinted in I
J.A. at 17-18, Tab 5.  In an affidavit, Ailts recounts
that:

> At some time following the time I informed the
> [Panel] of my intention to retire I had a
> passing conversation with Judge Charles Wolle.
> At that time he had recently returned from
> Washington, D.C.  He made a comment that while
> in Washington he had received information about
> an interest in the appointment of a female.  At
> this time I cannot recall the specific entity
> that he indicated expressed that interest to
> him.  I assumed at that time that he was
> referring to the Chief Probation Officer
> position which would be vacated upon my
> retirement since I had only recently indicated
> my intention to retire and I was unaware of any
> other vacant positions.  This was a brief
> conversation with Judge Wolle and the comment
> was made by him in passing.

Ailts Aff. (June 14, 1996) at 1-2, ¶ 3, reprinted in II
J.A. at 143-44, Tab 14.  Duffy contends that:

> In October of 1993 I had a conversation with Mr.
> Ailts.  During that conversation he informed me
> that Charles Wolle, the Chief Judge of the
> COURT, had recently returned from a conference
> in Washington with the Administrative Office of
> the United States COURTS.  He informed Mr. Ailts
> that the Administrative Office was recommending
> an aggressive effort on the part of the COURT to
> recruit minorities and females as candidates for
> the Chief Probation Officer position which was
> becoming vacant.

Duffy Aff. (June 13, 1996) at 8, ¶ 20, reprinted in II

J.A. at 124, Tab 10.

The Panel prepared a vacancy announcement for the CUSPO position and posted it in News and Views, a bi-weekly publication of the Probation Division of the Administrative Office of the United States Courts that was circulated nationwide to all probation officers.  The vacancy announcement stated that, to be qualified for the

CUSPO position, an applicant must possess "[a] 4-year degree from an accredited college or university with specialization in one or more of the social sciences appropriate to the position to be filled. An advanced degree in an appropriate area is preferred. In addition . . . applicants must possess [at least six] years of specialized experience . . . ." I J.A. at 25, Tab 5. The required "specialized experience" included "[p]rogressively responsible experience, including management responsibility, in the investigation, supervision, counseling, and guidance of offenders in community corrections or pretrial programs." Id. The vacancy announcement also explained that, as part of his duties, a CUSPO "[r]eviews, analyzes, and interprets statutory, Judicial Conference, and Parol Commission requirements for administration of probation and parole services; promulgates policies, procedures and guidelines needed to meet these requirements . . . ." Id.

The Panel created a screening committee to review applications for the CUSPO position. The screening committee members included Judge Longstaff, Ailts, Don Nickerson, who was the United States Attorney for the Southern District of Iowa, and Paul Zoss, who was the Federal Public Defender for the Southern District of Iowa. The screening committee was to select three to seven of the best qualified candidates for the CUSPO position and refer those applicants to the Panel.

The screening committee received sixteen applications for the CUSPO position. As a courtesy to applicants who were currently employed as probation officers for the Southern District of Iowa, the screening committee

elected to forward all such applicants to the Panel for consideration. The screening committee ultimately forwarded three names to the Panel: Jane McPhillips, who was a Supervising United States Probation Officer for the District of Minnesota; Duffy, who was a Supervising United States Probation Officer for the Southern District of Iowa; and John Stites, who was a Senior United States Probation Officer for the Southern District of Iowa.

McPhillips had worked as a United States Probation Officer since 1972, and had been a supervising probation officer since 1990. During her tenure, McPhillips had served in the District of Minnesota office, the Northern District of Texas office, and in temporary duty positions with the Administrative Office of the United States Courts and the United States Sentencing Commission. McPhillips held a bachelor's degree in psychology, a master's degree in counseling and guidance, and a juris doctorate. McPhillips had been a licensed attorney since 1985, and was a member of the state bar of Texas.

Duffy had served as a United States Probation Officer since 1974, and had served as a supervising probation officer since 1990. Duffy had served only in the Southern District of Iowa. Duffy held a bachelor's degree in psychology, a master's degree with an emphasis in rehabilitation, psychological counseling, and corrections, and in 1971-72 had participated in, but had not completed, an educational and school psychology doctoral program.

A full description of Stites's qualifications is not contained in the record. See I J.A. at 34-36, Tab 5 (incomplete resume of John Stites). It appears, however, that Stites had less experience than either McPhillips or Duffy as a probation officer, see id. at 34 (noting that Stites was employed in 1976 by the Bi-State Metropolitan Planning Commission in Rock Island, Illinois), and there is no indication that Stites had ever earned an advanced degree.

The Panel interviewed each of the applicants. While the members of the Panel were personally familiar with

Duffy's and Stites's work, Panel members contacted judges in Minnesota to obtain other jurists' impressions of McPhillips. Judge Vietor explained that he "spoke personally with Judge James Rosenbaum and Senior Judge Harry MacLaughlin of the United States District Court for the District of Minnesota," and that they "spoke very well of Ms. McPhillips'[s] abilities and unequivocally and highly recommended her for the position of Chief Probation Officer." Vietor Aff. (Apr.

26, 1996) at 2, ¶ 4, <u>reprinted in</u> I J.A. at 99, Tab 6. Judge Longstaff stated that he had spoken with Chief Judge Magnuson and Judge Rosenbaum of the District of Minnesota. "Both judges were highly complimentary in their praise and recommendation of Ms. McPhillips." Longstaff Aff. (May 1, 1996) at 4, ¶ 5, <u>reprinted in</u> II J.A. at 104, Tab 7.

In addition, the Panel received recommendations regarding McPhillips and Duffy from their current supervisors. Ailts, Duffy's outgoing supervisor, recommended that Duffy be appointed. <u>See</u> Ailts Aff. at 2, ¶ 5, <u>reprinted in</u> II J.A. at 144, Tab 14. Glenn Baskfield, CUSPO for the District of Minnesota and McPhillips's supervisor, advised the Panel that "there is little doubt that [McPhillips] would make an excellent Chief Probation Officer." I J.A. at 41, Tab 5.

The Panel unanimously agreed to appoint McPhillips to the position of CUSPO for the Southern District of Iowa. Each member of the Panel has unequivocally declared that McPhillips was the best candidate for the position, and that her gender did not play a role in their decision to appoint her. Chief Judge Wolle stated that:

> At no time during the selection process did gender play any role in our consideration of the applicants. I voted to select McPhillips because she was the most qualified person by reason of her experience, her education, her demeanor during the interview, the letters of reference received with her resume, and the uniformly very complimentary comments of the Minnesota district judges and court officers we phoned.

-11-

Wolle Aff. at 3-4, ¶ 8, <u>reprinted in</u> I J.A. at 19-20, Tab 5.  Judge Vietor stated that:

> I independently concluded that Ms. McPhillips was the best qualified applicant for the position. I was impressed with Ms. McPhillips'[s] experience, which included significant supervisory responsibility in the District of Minnesota. I was also impressed with Ms. McPhillips'[s] academic accomplishments which included going to law school and

> obtaining a juris doctor degree while she was serving as a probation officer in Minnesota. Ms. McPhillips'[s] attributes also included extensive legal and practical experience with the Federal Sentencing Guidelines. One or more of the Minnesota judges I spoke with also commented on her excellent interpersonal skills with staff, and I considered that a good attribute. In reaching my conclusion I did not in any way consider the gender of Ms. McPhillips or the gender of Mr. Duffy and Mr. Stites. Gender of the three was not mentioned in discussions among Chief Judge Wolle, Judge Longstaff and myself.

Vietor Aff. at 2-3, ¶ 5, reprinted in I J.A. at 99-100, Tab 6. Judge Longstaff stated that:

> It was my opinion that Ms. McPhillips was the best qualified person of the three finalist applicants to assume the responsibilities of Chief Probation Officer. In coming to this conclusion, I was influenced not only by Ms. McPhillips'[s] strong academic background and work experience but also by the recommendations which I had received during phone conversations from Chief Judge Magnuson and Judge Rosenbaum . . . . Ms. McPhillips'[s] gender played no role whatsoever in the [Panel]'s deliberations.

Longstaff Aff. at 3-4, ¶ 5, reprinted in 103-04, Tab 7. On March 14, 1994, the Panel entered an order appointing McPhillips as CUSPO for the Southern District of Iowa beginning May 2, 1994. See I J.A. at 43, Tab 5.

Subsequently, Duffy spoke with Judge Longstaff during a fifty-minute meeting about the Panel's decision to appoint another candidate, and Judge Longstaff told Duffy that "it had been a very difficult decision . . . ."

-13-

Duffy Aff. at 10, ¶ 24, <u>reprinted in</u> II J.A. at 126, Tab 10.  During a five- to ten-minute conversation between Chief Judge Wolle and Duffy, Chief Judge Wolle stated that he understood Duffy's disappointment, and "encouraged [Duffy] to pursue what he called [Duffy's] 'cutting edge ideas' for the operation, management and development of the PROBATION OFFICE which [Duffy]

had presented in [his] interview."  Id. at 10-11, ¶ 26, reprinted in II J.A. at 126-27, Tab 10.

Although the Southern District of Iowa had in place an Equal Employment Opportunity Plan (EEO Plan) that provided a mechanism for pursuing complaints of employment discrimination, Duffy did not access any administrative remedies.  Instead, on March 8, 1996, Duffy filed a Bivens action against the Panel.  In his complaint, Duffy alleged that the Panel had violated Duffy's Fifth Amendment right to due process when it denied Duffy equal protection under the law by hiring a "substantially less qualified female applicant" because of her gender.  See Compl. at 4, ¶ 11, reprinted in I J.A. at 6, Tab 2.  Duffy sought a declaratory judgment that the Panel had acted unconstitutionally, an injunction requiring his appointment to the CUSPO position, unspecified monetary damages, and costs and attorney's fees.  Id. at 5-6, ¶¶  A-D, reprinted in I J.A. at 7-8, Tab 2.

The Panel filed a motion to dismiss with the district court.  Because the motion had been supported by affidavits and accompanying documents, the district court construed the motion as a motion for summary judgment. See Mem. Op. & Order (Aug. 5, 1996) at 1, reprinted in II J.A. at 158, Tab 18.  The district court rejected several of the Panel's arguments, including the Panel's contention that Duffy was precluded from bringing a Bivens action because of the availability of administrative remedies, see id. at 11, reprinted in II J.A. at 168, Tab 18,  and the Panel's claim of absolute immunity.  See id. at 14, reprinted in II J.A. at 171,

Tab 18.  After conducting an analysis of qualified immunity, the district court granted summary judgment to the Panel.  Id. at 21-22, reprinted in II J.A. at 178-79, Tab 18 ("because Plaintiff has insufficient support for his claims, and because policy considerations mandate a 'firm application of the Federal Rules of Civil Procedure,' Butz v. Economou, 438 U.S. 478, 508 (1978), to avoid subjecting public officials to the expense and distraction of trial, the defendants' motion to dismiss, treated as a motion for summary judgment, will be granted" (footnote omitted)).

Prior to the district court's grant of summary judgment, Duffy's counsel had filed a Federal Rule of Civil Procedure 56(f)[4] affidavit and a Memorandum in Opposition to the Motion to Dismiss expressing the need for additional discovery.  See Baker Aff. (June 17, 1996) at  2, ¶ 4, reprinted in II J.A. at 112, Tab 8 ("Until [Duffy] conducts discovery and specifically has the opportunity to depose each of the Defendants he is not in a position where he can reasonably make a presentation that the Plaintiff's [sic] explanations for their actions are a pretext for unlawful discrimination."); Mem. in Opp'n to the Mot. to Dismiss (June 20, 1996) at 28, § VII ("[Duffy] further requests that since the affidavits of the Defendants do not address the prima facie claim of gender discrimination of the Plaintiff that [the Court] either deny the summary judgment aspect of the motion or stay any consideration of that motion and allow the Plaintiff to undertake discovery.").  The district court, however, concluded that additional discovery was unnecessary.  See Mem. Op. & Order at 21, reprinted in II J.A. at 178, Tab 18 ("[T]he Court does not believe that allowing Plaintiff to conduct discovery would aid his case.  The Court has before it affidavits from all the defendants and all the members of the screening panel.  The affidavits support the defendants' position.").  Duffy now appeals.

## II.

---

[4]Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).

We review the district court's grant of summary judgment de novo.  See Helfter v. United Parcel Serv., Inc., 115 F.3d 613, 615 (8th Cir. 1997).  We may affirm the district court's grant of summary judgment only if, examining the evidence in the light most favorable to Duffy, the record "demonstrates 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  Id. (quoting Fed. R. Civ. P. 56(c)). While "summary judgment should seldom be granted in employment discrimination cases, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case."  Helfter, 115 F.3d at 615-16 (quotations and citations omitted).

Duffy's action against the Panel is premised on the Panel's alleged decision to employ a less-qualified female applicant, rather than Duffy, because of her gender.  The Due Process Clause of the Fifth Amendment to the United States Constitution has been interpreted to forbid the federal government from discriminating on the basis of gender unless such discrimination is substantially related to the achievement of an important governmental objective.  See Davis v. Passman, 442 U.S. 228, 234-35 (1979).  In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court recognized in the Constitution and the general federal question jurisdictional statute, 28 U.S.C. § 1331, an inherent cause of action for damages against federal actors for violations of federal constitutional rights. See Bivens, 403 U.S. at 396 ("it is well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such

-18-

invasion, federal courts may use any available remedy to make good the wrong done" (quotations, citation, and alteration omitted)). Duffy's claim of employment discrimination is, accordingly, a cognizable <u>Bivens</u> action. <u>See</u> <u>Davis</u>, 442 U.S. at 244 (congressman's secretary could pursue <u>Bivens</u> action against employer when she was dismissed solely because of her gender).

**A.**

The Panel has asserted several affirmative defenses to support the district court's grant of summary judgment. First, the Panel asserts that it is eligible for absolute judicial immunity from Duffy's suit. We disagree.

"As a class, judges have long enjoyed a comparatively sweeping form of immunity . . . ." Forrester v. White, 484 U.S. 219, 225 (1988). This absolute immunity from suit allows judges to fulfill their duties without concern for their own fortunes, which helps to ensure that their duties will be performed impartially and completely. See id. at 223-24. Judicial immunity does not derive from the persona of the judge, however, but rather from the judicial acts performed by the judge. Accordingly, while judges enjoy absolute immunity when performing "paradigmatic judicial acts involved in resolving disputes between parties who have invoked the jurisdiction of a court," id. at 227, "[a]dministrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts." Id. at 228.

In Forrester, the Supreme Court dealt with a nearly identical situation as the instant case. There, a state court judge fired a probation officer. The probation officer brought suit, alleging racial discrimination. The Supreme Court held that the judge's termination of an employee was an administrative act, see id. at 229, and that the judge was not eligible for absolute immunity. Id. at 230. See also Bryant v. O'Connor, 848 F.2d 1064, 1067 (10th Cir. 1988) (absolute immunity not available to federal judge sued for racial discrimination in

-20-

termination of probation officer).

In the instant matter, the Panel seeks to distinguish <u>Forrester</u> because the "[a]ppointment of a chief probation officer now involves considerations beyond the mere administrative tasks of evaluating and promoting employees." Appellees' Br. at 15. While this is undoubtedly correct, we fail to see how these additional considerations can transform an administrative decision, albeit an extremely important administrative decision, into a judicial one. We conclude that the district court correctly held that the Panel is not eligible for absolute immunity in this matter.

**B.**

In allowing the plaintiff's cause of action to proceed in <u>Bivens</u>, the Supreme Court noted that "[t]he present case involves no special factors counseling hesitation in the absence of affirmative action by Congress." 403 U.S. at 396. In the instant matter, the Panel contends that "special factors counseling hesitation" exist because Duffy could have filed an administrative complaint regarding the alleged employment discrimination under the EEO Plan for the United States District Court for the Southern District of Iowa. <u>See</u> Appellees' Br. at 20. Because Duffy could have accessed the EEO Plan remedies, the Panel suggests that Duffy's suit be dismissed. <u>See, e.g.</u>, <u>Carter v. Kurzejeski</u>, 706 F.2d 835, 839 n.5, 842-43 (8th Cir. 1983) (dismissing <u>Bivens</u> action because "the arbitral and administrative procedures recognized and created by the Civil Service Reform Act, which provide ultimately for some judicial review, are the <u>exclusive</u> means of redress from a discharge from federal employment based on anti-union animus, thus barring independent federal district court jurisdiction under other statutes altogether" (emphasis in original)). Respectfully, we must again disagree.

The administrative scheme relied on by the Panel was instituted at the direction of the Judicial Conference. <u>See</u> I J.A. at 46, Tab 5. In <u>Krueger v. Lyng</u>, 927 F.2d 1050 (8th Cir. 1991), we emphasized that:

> <u>Only Congress</u> has the power to decide that a statutory or administrative scheme will foreclose a <u>Bivens</u> action. To allow an

administratively-created scheme to foreclose a <u>Bivens</u> action, without some real indication that Congress intended the administratively-created scheme to have that result, would require us to hold that the legislative power to foreclose a <u>Bivens</u> action has been delegated--a delegation almost certainly in violation of the separation of powers doctrine.

<u>Id.</u> at 1055 (citations omitted) (emphasis added). In this case, the Panel has presented no support that Congress intended to delegate to the Judicial Conference the authority

to preempt a <u>Bivens</u> action in favor of administrative remedies. We accordingly conclude that Duffy is not forestalled from pursuing a <u>Bivens</u> action on this ground.

## C.

Finally, the Panel argues that it is entitled to qualified immunity from Duffy's suit. Public "officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). "This is an objective standard," <u>Swenson v. Trickey</u>, 995 F.2d 132, 133 (8th Cir. 1993), and its application to the circumstances of a particular case presents a question of law. <u>Id.</u> We have held that

> [a] right is 'clearly established' for qualified immunity purposes if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

<u>Id.</u> at 133-34 (quotations, citations, and alterations omitted).

In <u>Davis</u>, filed in 1979, the Supreme Court made clear that federal employees have a Fifth Amendment right to be free of discrimination on the basis of gender. <u>See</u> 442

U.S. at 234-35.  In  <u>Regents of the University of California v. Bakke</u>, 438 U.S. 265 (1978), the Court considered a claim of reverse discrimination on the basis of race, and declared that "[p]referring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake.  This the Constitution forbids."  <u>Id.</u> at 307.  It was thus well established by 1979 both that gender discrimination was prohibited by the constitution and that discrimination against historically empowered groups was forbidden by the constitution.  We believe that the synthesis of these two

concepts was readily perceivable by 1993, the time of the Panel's alleged constitutional violation. We therefore agree with the district court that a reasonable person would have known, when the Panel made its CUSPO hiring decision, that a male federal employee had a clearly established constitutional right to be free of gender discrimination. See Mem. Op. & Order at 18, reprinted in II J.A. at 175, Tab 18.

The remaining question, however, is whether the Panel's conduct violated this well-established right. As the district court noted, "[i]t is at this point that the defense of qualified immunity begins to look like a ruling on the merits." Id. at 16 n.4, reprinted in II J.A. at 173, Tab 18. Accordingly, we address the merits of Duffy's Bivens action.[5]

### III.

Typically, employment discrimination cases are brought under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17. Recognizing that, by their nature, employment discrimination claims are often difficult to prove, the Supreme Court crafted a burden

---

[5]In reaching the merits of Duffy's claim, the district court's analysis was somewhat enigmatic. See Mem. Op. & Order at 18-22, reprinted in II J.A. at 175-79, Tab 18. While "we recognize that our analysis differs from that of the district court," Yowell v. Combs, 89 F.3d 542, 544 n.4 (8th Cir. 1996), we may "affirm the district court on any grounds supported by the record." Id. (affirming district court's grant of summary judgment); see also Tyus v. Schoemehl, 93 F.3d 449, 453 n.6 (8th Cir. 1996) (holding that this Court "may affirm the district court's grant of summary judgment on any ground supported by [the] record" (quotations and citation omitted)), cert. denied, 117 S. Ct. 1427 (1997).

shifting analysis for evaluating the merits of Title VII claims in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981). Under this analysis:

> First, the plaintiff must demonstrate the ability to prove the four elements of a prima facie case. To make this showing, not a difficult or onerous

burden, the record must demonstrate that plaintiff can prove: 1) that she is a member of a protected class; 2) that she applied and was qualified for a job for which the employer was seeking applicants; 3) that she was rejected; and 4) that after rejecting plaintiff the employer continued to seek applicants with plaintiff's qualifications. . . . Under Title VII she must show that the employer hired a man for the position. . . . The prima facie case, in the absence of an explanation from the employer, creates a rebuttable presumption of discrimination.

In the second part of the McDonnell Douglas analysis the burden shifts to the defendant who must rebut the presumption of discrimination by producing evidence, that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This is a burden of production not proof. The defendant need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor. In the third and final part of the analysis, the burden shifts back to plaintiff once the defendant has met its burden of production. Plaintiff must then establish the existence of facts which if proven at trial would permit a jury to conclude that the defendant's proffered reason is pretextual and that intentional discrimination was the true reason for the defendant's actions.

Krenik v. County of Le Sueur, 47 F.3d 953, 957-58 (8th Cir. 1995) (quotations and citation omitted). See also Lang v. Star Herald, 107 F.3d 1308, 1311 (8th Cir. 1997) ("Once the [defendant] advances a nondiscriminatory reason, [the plaintiff] must show, in this summary judgment proceeding, that she has sufficient admissible

evidence from which a rational factfinder could find that the [defendant's] proffered nondiscriminatory reason was either untrue or not the real reason, and that intentional discrimination was the real reason." (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993); Ryther v. KARE 11, 108 F.3d 832, 838 n.5 (8th Cir.) (en banc), cert. denied, 117 S. Ct. 2510 (1997); Ryther, 108 F.3d at 848 n.13 (Part I.A. of concurring and dissenting opinion, in which eight active judges joined))), petition for cert. filed, (U.S. June 5, 1997) (No. 96-9275).

In reverse discrimination cases, several courts have held that, to present a prima facie case, a plaintiff must show "that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." <u>Murray v. Thistledown Racing Club, Inc.</u>, 770 F.2d 63, 67 (6th Cir. 1985) (quotations and citations omitted); <u>see also</u> <u>Bishopp v. District of Columbia</u>, 788 F.2d 781, 786 (D.C. Cir. 1986) ("A plaintiff's minority status by itself is sufficient in light of historical practice in the workplace toward such socially disfavored groups to give rise to an inference of discriminatory motivation. White males, who as a group historically have not been hindered in the workplace because of their race or sex, are required to offer other particularized evidence, apart from their race and sex, that suggests some reason why an employer might discriminate against them." (quotations, citations, and alterations omitted)). However, "[j]ust because a reverse discrimination claimant cannot show the background circumstances necessary to trigger the <u>McDonnell Douglas</u> presumption does not inexorably mean that his employer has not intentionally discriminated against <u>him</u>. . . . An employee who is the victim of intentional discrimination in such circumstances, and who adduces sufficient evidence of that discrimination, should be permitted to proceed beyond the prima facie case stage of litigation." <u>Notari v. Denver Water Dep't</u>, 971 F.2d 585, 590 (10th Cir. 1992) (emphasis in original).

While Duffy is statutorily exempt from bringing a claim under Title VII, <u>see</u> 42 U.S.C. § 2000e-16, Duffy nevertheless contends that we should apply the <u>McDonnell</u>

Douglas analysis to his Bivens claim.  We agree.  While a Title VII analysis is not always identical to a constitutional analysis, see, e.g., Johnson v. Transportation Agency, 480 U.S. 616, 627 n.6 (1987) (rejecting argument that "the obligations of a public employer under Title VII must be identical to its obligations under the constitution"), we have applied the McDonnell Douglas analysis to a claim of employment discrimination brought under 42 U.S.C. § 1983 as a violation of the Fourteenth Amendment.  See Richmond v. Board of Regents of Univ. of Minn., 957 F.2d 595, 598 (8th Cir. 1992).  "[A]n action under Bivens is almost identical to an

action under section 1983, except that the former is maintained against federal officials while the latter is against state officials." Sanchez v. United States, 49 F.3d 1329, 1330 (8th Cir. 1995) (per curiam) (quotations and citations omitted); see also Chin v. Bowen, 833 F.2d 21, 24 (2d Cir. 1987) ("Both Bivens and section 1983 actions are designed to provide redress for constitutional violations. Though the two actions are not precisely parallel, there is a general trend in the appellate courts to incorporate § 1983 law into Bivens suits." (quotations, citations, and footnote omitted)). Accordingly, we believe it proper to apply the McDonnell Douglas analysis to Duffy's Bivens claim.

We conclude that Duffy has made a prima facie case of employment discrimination. Duffy, a male, applied for and was qualified for the CUSPO position that was ultimately given to a female applicant. Duffy has alleged three "background circumstances [to] support the suspicion that the [Panel] is that unusual employer who discriminates against the majority." Murray, 770 F.2d at 67 (quotations and citations omitted). These background circumstances are: (1) that McPhillips was substantially less qualified than Duffy; (2) Chief Judge Wolle had mentioned an interest by someone in the Administrative Office in the recruitment of a female; and (3) that two members of the Panel had usually hired female law clerks. In presenting a prima facie case, Duffy has created a presumption that the Panel discriminated against him on the basis of gender. To rebut this presumption, the Panel had the burden of presenting evidence that Duffy "was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Krenik, 47 F.3d

-32-

at 958 (quotations omitted).  The Panel has met this burden.  Each member of the Panel explained, in their affidavits, that McPhillips was selected on the basis of non-discriminatory criteria.  <u>See</u> Wolle Aff. at 3-4, ¶ 8, <u>reprinted in</u> I J.A. at 19-20, Tab 5; Vietor Aff. at 2-3, ¶ 5, <u>reprinted in</u> I J.A. at 99-100, Tab 6; Longstaff Aff. at 3-4, ¶ 5, <u>reprinted in</u> II J.A. at 103-04, Tab 7. These criteria include McPhillips's experience, education, and demeanor during her interview, as well as the strong recommendations of jurists familiar with McPhillips's work.

Because the Panel successfully rebutted the presumption of discrimination created by Duffy's prima facie case, "the burden shifts back to [Duffy]" to "establish the existence of facts which if proven at trial would permit a jury to conclude that the defendant[s'] proffered reason is pretextual and that intentional discrimination was the true reason for the defendant[s'] actions." Krenik, 47 F.3d at 958. The only allegations Duffy has made are those that support his prima facie case: (1) McPhillips was substantially less qualified than Duffy; (2) Chief Judge Wolle had mentioned an interest by someone in the Administrative Office in the recruitment of a female; and (3) two members of the Panel had usually hired female law clerks. We address these allegations in turn.

In the usual course of business, an employer will naturally hire the most qualified candidate for a position. See Harding v. Gray, 9 F.3d 150, 153 (D.C. Cir. 1993) ("A rational employer can be expected to promote the more qualified applicant over the less qualified, because it is in the employer's best interest to do so."). Evidence that an employer hired a less qualified candidate for a position can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual. Cf. id. at 153-54 ("when an employer acts contrary to his apparent best interest in promoting a less-qualified minority applicant, it is more likely than not that the employer acted out of a discriminatory motive"). See also Chock v. Northwest Airlines, Inc., 113 F.3d 861, 864 (8th Cir. 1997) ("Where, as here, the employer contends that the selected candidate was more qualified for the position than the plaintiff, a comparative analysis of the qualifications

is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision. . . . [A] comparison that reveals that the plaintiff was only similarly qualified or not as qualified as the selected candidate would not raise an inference of racial discrimination."). Identifying those strengths that constitute the best qualified applicant is, however, a role best left to employers; as we have often noted, "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except

to the extent that those judgments involve intentional discrimination." Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995). This is true even when those making employment decisions are federal judges.

In this case, Duffy contends that he was more qualified than McPhillips for the CUSPO position because he had more experience than McPhillips in areas such as management training. See Appellant's Br. at 31-32. We disagree. In light of McPhillips's competing areas of expertise, it is not evidence of pretext that Duffy had more experience in certain areas than did McPhillips but was nevertheless not selected for the position. It is inevitable that two candidates with a combined forty years of experience as probation officers will have different strengths. We do not see how the Panel's preference for McPhillips's depth of experience in the area of presentence investigation over Duffy's breadth of experience in the areas of pretrial and supervision can be interpreted as pretextual for gender discrimination. See id. (contrasting applicants' qualifications).

It is uncontested that McPhillips received glowing recommendations from Minnesota jurists, and Duffy does not challenge the Panel members' perceptions of McPhillips's interviewing skills. In comparing McPhillips's objective qualifications with Duffy's, it is apparent that McPhillips was not "substantially less qualified" than Duffy. McPhillips had two years more experience than Duffy as a United States Probation Officer. While Duffy had only a bachelor's degree and a master's degree, McPhillips had a bachelor's degree, a

-36-

master's degree, and a law degree.[6]  While Duffy

---

[6]Duffy contends that "a law degree was not considered as relevant for the position in the vacancy announcement." Appellant's Br. at 35 n.13. We disagree. The Vacancy Announcement specified that, as part of his duties, a CUSPO "[r]eviews, analyzes, and interprets statutory, Judicial Conference, and Parol Commission requirements for administration of probation and parole services . . . ." I J.A. at 25, Tab 5. We believe that legal training would clearly be valuable to someone performing these duties.

only had experience in the Southern District of Iowa, McPhillips had experience in two larger judicial districts, the Administrative Office, and the United States Sentencing Commission. Under these nondiscriminatory criteria--which the Panel was free to rely on--McPhillips was the stronger candidate for the CUSPO position.

Nor do we believe that the Administrative Office's alleged interest in obtaining a diverse pool of applicants can support a finding of pretext. See Wolle Aff. at 1-2, ¶ 2, reprinted in I J.A. at 17-18, Tab 5 (recounting that the Administrative Office wished the Panel to "advertise the [CUSPO] position in a publication of national circulation to reach all persons who might be interested so [the Panel] could have an open, nationwide, diverse pool of qualified applicants"); Ailts Aff. at 1-2, ¶ 3, reprinted in II J.A. at 143-44, Tab 14 (describing a statement by Chief Judge Wolle "about an interest in the appointment of a female" to what Ailts assumed was the CUSPO position); Duffy Aff. at 8, ¶ 20, reprinted in II J.A. at 124, Tab 10 (contending that "the Administrative Office was recommending an aggressive effort on the part of the COURT to recruit minorities and females as candidates for the Chief Probation Officer position which was becoming vacant").[7]

---

[7]There is no indication in the record that the Panel actually took steps to specifically recruit female candidates. Indeed, in the Vacancy Announcement published in News and Views, there is no reference to gender. Instead, the Panel explicitly declares that "THE COURT IS AN EQUAL OPPORTUNITY EMPLOYER." I J.A. at 25, Tab 5. We will assume, however, that a jury could find that the indication of interest from the Administrative Office could have influenced the Panel to recruit female applicants for the CUSPO position.

An employer's affirmative efforts to recruit minority and female applicants does not constitute discrimination. See Shuford v. Alabama State Bd. of Educ., 897 F. Supp. 1535, 1553-54 (M.D. Ala. 1995) ("affirmative recruitment is a neutral measure") (interpreting Ensley Branch, N.A.A.C.P. v. Seibels, 31 F.3d 1548, 1571 (11th Cir. 1994), and Peightal v. Metropolitan Dade County, 26 F.3d 1545, 1557-58 (11th Cir.

1994)).  An inclusive recruitment effort enables employers to generate the largest pool of qualified applicants and helps to ensure that minorities and women are not discriminatorily excluded from employment.  See id.  This not only allows employers to obtain the best possible employees, but it "is an excellent way to avoid lawsuits." Id.  The only harm to white males is that they must compete against a larger pool of qualified applicants.  This, of course, "is not an appropriate objection," id., and does not state a cognizable harm.[8]

All that is left to support Duffy's allegation of pretext is, therefore, Duffy's assertion that two of the Panel's members have hired more female law clerks than male law clerks.  See Duffy Aff. at 11, ¶ 27, reprinted in II J.A. at 127, Tab 10 (alleging that  of Chief Judge Wolle's eight law clerks, six have been female, and that of Judge Longstaff's nine law clerks, eight have been female).  The district court disregarded this allegation, concluding that "the judges' law clerk hiring practices are irrelevant . . . ."  Mem. Op. & Order at 21 n.5, reprinted in II J.A. at 178, Tab 18.

"Relevant evidence" is defined by Federal Rule of Evidence 401 to be "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Our review of the district court's

_____

[8]It appears that Duffy himself would agree with this assessment of the benefits of inclusive recruitment.  In his resume, Duffy contends that one of his "MAJOR ACHIEVEMENTS" is that he "[e]ncouraged hiring of women and minorities for Probation Officer positions." I J.A. at 28, Tab 5.

determination of relevance is extremely deferential.  <u>See</u> <u>Gillming v. Simmons Indus.</u>, 91 F.3d 1168, 1172 (8th Cir. 1996) ("The district court has broad discretion in ruling on the admissibility of proffered evidence, and we review the court's decision for an abuse of that discretion.").

We do not believe that the district court abused its discretion in disregarding this allegation. The employment responsibilities--and working relationship with a judge--of a CUSPO differ dramatically from those of a judicial law clerk. <u>Compare</u> Vacancy Announcement, <u>reprinted in</u> I J.A. at 25, Tab 5 (detailing duties of CUSPO), <u>with</u> <u>Bishop v. Albertson's, Inc.</u>, 806 F. Supp. 897, 899-902 (E.D. Wash. 1992) (detailing duties of a judicial law clerk). Only if we were to assume that the Panel members had a generalized discriminatory animus against males--a rather extraordinary bigotry to be found in an all-male group of judges--could the judges' law clerk hiring practices be relevant to the Panel's decision to hire McPhillips rather than Duffy for the CUSPO position. That these defendants hired a few more female law clerks than male is too slender an evidentiary reed to support such an extraordinary finding.

Standing against this lack of evidence of pretext is a universal declaration by each Panel member that McPhillips was not hired on the basis of her gender. <u>See</u> Wolle Aff. at 3-4, ¶ 8, <u>reprinted in</u> I J.A. at 19-20, Tab 5; Vietor Aff. at 2-3, ¶ 5, <u>reprinted in</u> I J.A. at 99-100, Tab 6; Longstaff Aff. at 3-4, ¶ 5, <u>reprinted in</u> II J.A. at 103-04, Tab 7. In addition, none of the screening committee members have alleged that gender played any role in McPhillips's selection, and two affirmatively declared that it did not. <u>See</u> Zoss Aff. (June 25, 1996) at 6-7, ¶¶ 15-16, <u>reprinted in</u> II J.A. at 153-54, Tab 16 ("At the time the committee made its recommendation, I did not believe that either David Duffy or John Stites were as qualified for the position as Jane McPhillips. . . . From my knowledge of the selection

-42-

process, the gender of Jane McPhillips and David Duffy played no part in the selection process for the chief probation officer for the Southern District of Iowa."); Nickerson Aff. (June 28, 1996) at 2, ¶ 2, <u>reprinted in</u> II J.A. at 156, Tab 17 ("To my personal knowledge, the screening committee served as an objective appraiser of the qualifications of the applicants for the position. Gender of the applicants played no role in my consideration of the relative qualifications of each applicant. Likewise, it is my belief that the members of the committee held no predisposition with respect to the gender of the applicants who would ultimately be submitted to the court.").

In affirming a grant of summary judgment to a United States district judge in an employment discrimination suit brought by a terminated probation officer, the Tenth Circuit in Bryant v. O'Connor, 848 F.2d 1064 (10th Cir. 1988) explained that:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action.
>
> These considerations take on added significance in the instant case since Bryant [the plaintiff] charged a federal judge and a judicial officer with misconduct. In Harlow v. Fitzgerald, 457 U.S. 800, 819-20 n.35 (1982), the Supreme Court reiterated its admonition in Butz v. Economou, 438 U.S. 478, 507 (1978), that "'insubstantial' suits against high public officials should not be allowed to proceed to trial. . . . Insubstantial lawsuits undermine the effectiveness of government as contemplated by our constitutional structure, and 'firm application of the Federal Rules of Civil Procedure' is fully warranted in such cases." The same policy applies with at least equal force to an action against a member of the judiciary.

Id. at 1067-68 (quotations and citations omitted). We agree. Because the instant case presents no questions of material fact left in dispute, we conclude that the district court properly granted summary judgment to the Panel. See Fed. R. Civ. P. 56(c).

## III.

Duffy contends that the district court erred in granting summary judgment immediately, and that Duffy should have had the opportunity to conduct discovery prior to the entry of summary judgment. We disagree.

"'The standard of review of the district court's refusal to compel discovery is one of gross abuse of discretion.'" <u>Wilson v. International Bus. Machs. Corp.</u>, 62 F.3d 237, 240 (8th Cir. 1995) (quoting <u>Kinkead v. Southwestern Bell Tel. Co.</u>, 49 F.3d 454, 457 (8th Cir. 1995)). We have explained that "Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment, does not require trial courts to allow parties to conduct discovery before entering summary judgment." <u>United States v. Light</u>, 766 F.2d 394, 397 (8th Cir. 1985) (per curiam). Rather,

> [u]nder Rule 56(a), a motion for summary judgment can be filed <u>at any time</u> after twenty days from the commencement of the action or service of the motion on the other party. The party who is faced with a summary judgment motion before he has conducted discovery may, under Rule 56(f), request the court to postpone ruling on the motion until he conducts some discovery. However, . . . Rule 56(f) is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious. A party invoking its protections must do so in good faith by affirmatively demonstrating why he cannot respond to a movant's affidavits as otherwise required by Rule 56(e) and how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact. Where a party fails to carry his burden under Rule 56(f), postponement of a ruling on a motion for summary judgment is unjustified.

<u>Id.</u> at 397-98 (quotations, citations, footnote and

alterations omitted) (emphasis in original); see also Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 797–98 (8th Cir. 1996) (describing burden of party invoking Rule 56(f)).

In his Rule 56(f) affidavit, Duffy's attorney contends that "[u]ntil [Duffy] conducts discovery and specifically has the opportunity to depose each of the Defendants he is not in a position where he can reasonably make a presentation that the Plaintiff's [sic] explanations for their actions are a pretext for unlawful discrimination."

Baker Aff. at 2, ¶ 4, <u>reprinted in</u> II J.A. at 112, Tab 8. The district court rejected this argument, stating that "the Court does not believe that allowing Plaintiff to conduct discovery would aid his case.  The Court has before it affidavits from all the defendants and all the members of the screening panel.  The affidavits support the defendants' position."  Mem. Op. & Order at 21, <u>reprinted in</u> II J.A. at 178, Tab 18.

Duffy has made no supportable allegations of discrimination, and it is well settled that "Rule 56(f) does not condone a fishing expedition" where a plaintiff merely hopes to uncover some possible evidence of a constitutional violation.  <u>Gardner v. Howard</u>, 109 F.3d 427, 431 (8th Cir. 1997); <u>see</u> <u>also</u> <u>Bryant</u>, 848 F.2d at 1068 ("Appellant invites us to let him proceed with his case and depose almost the entire Kansas judiciary--proceedings that would be disruptive to the administration of justice, based solely on his bare assertions and in the face of strong evidence that he was dismissed for cause.  We decline the invitation.  We reject Bryant's demand for discovery as a last ditch effort made in the 'hope' that he then will be able to buttress his claims.  We hold as we do particularly in light of the policy considerations where a federal judge and judicial officer are charged as defendants.").  We conclude that the district court did not abuse its discretion in declining to compel discovery in this case.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the defendants.

A true copy.

    Attest:


        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.