# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3570

_____

Ellis Ray Barber,                            *
                                             *
        Appellant,               *
                                             *
v.                                           *    Appeal from the United States
                                             *    District Court for the
                                             *    Eastern District of Arkansas.
C1 Truck Driver Training, LLC;               *
C & S Acquisition, Inc.; and                 *
Driver Holdings, LLC,                        *
                                             *
        Appellees.               *

_____

Submitted: June 15, 2011
Filed: September 20, 2011

_____

Before BYE and MELLOY, Circuit Judges, and ERICKSEN,[1] District Judge.

_____

ERICKSEN, District Judge.

     Ellis Ray Barber sued C1 Truck Driver Training, LLC, C & S Acquisition, Inc., and Driver Holdings, LLC ("C1"). He asserts racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, sitting by designation.

2000e to 2000e-17) and the Arkansas Civil Rights Act (Ark. Code Ann. §§ 16-123-101 to -108) ("ACRA"). The district court[2] granted C1's motion for summary judgment on all claims. For the reasons set forth below, we affirm.

## I.    Background

We state the facts in the light most favorable to Barber, "drawing all reasonable inferences" in his favor "without resort to speculation." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011). C1 is a truck driver training school based in Indianapolis, Indiana, with locations around the country. In August 2003, Barber began work for C1 as a classroom instructor in North Little Rock, Arkansas.

In 2006, C1 hired Barber's wife, Karmen Barber, to work in the administrative office. She was terminated later that year and filed a racial discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). In 2007, the EEOC dismissed Karmen Barber's charge and she did not pursue litigation.

### A.    Promotion Decision

In November 2007, David Morgan, then Director of the North Little Rock campus, announced he was leaving C1. Barber and Tami Simpson, a recruiter in the administrative office in C1's North Little Rock location, both applied for the position. The President of C1, Matt Carroll, and the Vice President of Operations, Tim Megard, traveled to North Little Rock to interview Barber and Simpson.

---

[2]The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas.

According to Barber, the Training Coordinator/Lead Instructor David Moore informed Barber that he had heard a rumor that the "selection process was a sham, because the company had already decided that Tami would get the position." (App. 403) Barber told Moore that if he did not get the position, he "would exercise [his] right under the law to challenge that" decision. (App. 68) In a written statement dated January 16, 2008, Moore described that on November 26, 2007, Barber approached him and "said if Tami gets this position that [Barber] was going to put his 2 weeks notice in and file a lawsuit for discrimination." (App. 126) Moore told Carroll about this conversation. (App. 50)

After interviewing both candidates and discussing their qualifications with Morgan, Megard and Carroll selected Simpson for the position. Carroll documented the decision in a memo dated November 30, 2007. (App. 51) Carroll also detailed the decision in an undated memo labeled "Hiring Decision." (App. 49-50)

The "Hiring Decision" memo states that Morgan recommended Simpson for the position because Barber's style could be abrasive and divisive; Barber could be arrogant; Morgan thought C1 would lose staff if Barber were hired; and Morgan was concerned about Barber's ability to put in the required hours. In contrast, Morgan believed Simpson had the respect of all of the staff; Simpson had "deep roots with government agencies" that could boost enrollment; Simpson was dependable; and Simpson had experience running C1 when Morgan was absent. The "Hiring Decision" memo also evaluates the performance of Barber and Simpson during their interviews, concluding that Simpson gave superior answers. The "Hiring Decision" memo also notes, "Per David Moore," that Barber stated he would file a lawsuit for discrimination if not promoted. The "Hiring Decision" memo states, "Honestly, why in the world would the company want to promote a person who had such a negative view of the company?" (App. 50) Finally, the "Hiring Decision" memo notes that Barber raised the issue of his wife's

-3-

termination in his interview "unprompted and on his own." Barber maintains that this was in response to a question about his most difficult experience at C1. The "Hiring Decision" memo states, "I personally believe he did this so that he could later sa[y] that it was brought up and if he wasn't hired, he could use that as a reason." The November 30 memo recounts that Morgan had positive things to say about both candidates but "strongly recommended" Simpson. (App. 51) The November 30 memo also discusses the interview performance of both candidates and is specific about perceived differences between the candidates. For example, the November 30 memo states:

> Mr. Barber understands fully what is required to train students. Ms. Simpson understands the process pretty well which is good but not as good. Ms. Simpson, however, has managed the office. She understands all the paperwork that must be completed and communicated to corporate, the same for our carrier customers such as CRST, how to recruit students, and she has relationships with caseworkers at the WIA offices across the state that are a vital source of our revenue. We believe that her knowledge base is far more important to the over all success of the new director. Because of these duties, she also has a relationship with employees at corporate in three of our other companies and those individuals speak highly of her.

(App. 51)

In an affidavit filed on May 17, 2010, with Barber's brief in opposition to C1's motion for summary judgment, Morgan asserts that he discussed both candidates with Megard and Carroll but that he did not specifically recommend either one. Morgan stated that Barber "had superior qualifications" because he had fleet management experience in the military, he had a commercial driver's license ("CDL"), and he was an "excellent instructor." Morgan also stated that several people at C1 were "not very fond" of Barber but estimated that the numbers of employees who disliked Barber and Simpson were approximately equal. Morgan

observed that Simpson had sales and office experience but that some trainers were concerned she did not have the "qualifications and experience to be the site director, and [she] did not have a CDL." According to Morgan, a CDL was important for any new director because it would help to gain the respect and confidence of the trainers.

Simpson began working as the director in December 2007. Around the same time, Barber received an award recognizing him as "the person with the most outstanding performance for the month of December, 2007." On December 14, 2007, Barber filed an EEOC charge alleging that he did not receive the promotion because of racial discrimination and in retaliation for complaining of racial discrimination and for his association with an individual who had previously filed an EEOC charge. Though the EEOC told Barber that it would mail the charge to C1 in ten days, C1 did not receive notice of the EEOC charge until after the promotion decision was final.[3]

---

[3]The specific date that C1 received notice of Barber's EEOC charge is not readily ascertainable from the parties' submissions. Barber asserts that his December 14 EEOC charge was received on January 18, 2008. In support, he cites his own deposition testimony. The cited testimony makes clear that January 18, 2008, is the date the EEOC received an amended charge, describing meetings he had with Simpson on January 15 and 16, 2008. (App. 440) Barber also cites his own affidavit, submitted in response to C1's motion for summary judgment before the district court, to argue that Simpson received notice of his charge during his vacation in December 2007. The affidavit states that Barber "timed the filing so that the company would get served with notice while [he] was on vacation." C1 denies receiving the December 14 charge before January 23, 2008. There is no dispute that C1 was aware of the charge by the time of Barber's termination. Barber amended the charge to include complaints related to discipline and termination on February 1, 2008, and March 13, 2008.

B.      Termination Decision

On January 14, 2008, Simpson, now the director of C1's North Little Rock location, instructed Barber to administer drug tests to the students. The weekly drug testing was usually a two-person task but Barber completed the work alone. On January 15, 2008, Barber and Simpson had a meeting during which Barber told Simpson that he thought she had made him perform the drug tests alone in retaliation for his having filed an EEOC charge. Simpson denied this, explaining that she had been too busy to assist with the testing. Barber recalls telling Simpson that "a person could have the right to refuse an order from their supervisor if they believed it to be discriminatory or retaliatory." (App. 90) Barber testified that Simpson asked whether he had told other C1 employees and students about his wife's EEOC charge. He explained that he had discussed it with other employees. Simpson then asked Barber how his job was going or if there were any issues preventing him from doing his job effectively. Barber answered that there were no issues and Simpson told him that she would be watching his job performance closely. (App. 448-50) Barber responded that this could be construed as retaliation. Simpson testified that she merely meant to say that, as a new director, she would be working with each instructor to see how they did their job and "learn their jobs."

On January 16, 2008, Barber and Simpson met again. Barber told Simpson that he was feeling ill because of their meeting the previous day—from "being harassed for filing a charge"—and that he wanted to see a doctor. Simpson told him he could take paid time off, but that she needed to call Megard first. Simpson called Megard who spoke with Barber on speaker phone. Megard wrote the following description in an e-mail to Carroll:

Tami [Simpson] called me this [morning] at about 7:20 as I was driving to the office. She had Ray [Barber] in her office along with Althea and another C1 staff member as a witness. Ray wanted to talk to me on speaker about his issues. He claimed that he was ill after yesterday and wanted to . . . see a doctor. He stated that he was dehydrated, couldn't sleep or eat after the day he had on Tuesday. He cited that Tami had asked him why he was telling students that C1 had wronged his wife and that she had taken action against us.

He said that we had been served on December 20th papers on his lawsuit and he had also filed with EEOC yesterday after work I guess. He wanted to start arguing and I told him that I was not going to argue with him. I had him pick up the phone earlier in the conversation because I couldn't hear him. Once I told him I was not going to argue he seemed to get more irritated. I told him that I couldn't tell him what to do or not do but that C1 had hired him to be a classroom instructor and him being able to perform his duties did concern me. Once he could tell that I wasn't going to argue and make a scene about it, he hung up[,] and Tami said he walked out.

I am going to have Tami and others present also write a statement on Ray's behavior. I called back after relaying to Matt [Carroll] that Ray blew up and I feel he is trying to do anything to get us to fire him. Maybe after talking to a lawyer and EEOC, he feels the only way to better his position is if we actually fire him. I guess we need to decide today what Tami should tell him if and when he comes back. I am having Tami also get statements from any students that Ray talked to about Karmen.

(App. 137) Barber was absent on January 16 and 17, 2008. On January 17, he saw a doctor. Simpson requested that Barber provide a doctor's note. Before producing the note, Barber questioned Simpson's authority to require the submission of a note, citing a provision of C1's policy manual that requires a doctor's note before an employee may return to work after missing "more than" two consecutive days. (App. 169) On January 23, 2008, Barber received a final

written warning for insubordination. The warning describes the conversations of January 15 and 16, and states that future insubordination will result in termination:

On January 15, 2008 Ray [Barber] met with Tami Simpson. In the meeting Ray was rude and disrespectful toward Tami. Ray told Tami that she should not have gotten the director[']s position. He also told her that he could do whatever he wants because he is covered by the EEOC based on his wife filing a claim against C1. This behavior is intolerable. Tami is Ray Barber's supervisor and there is no excuse for speaking to anyone in the company this way let alone his supervisor. It is also insubordination to tell his supervisor that she cannot supervise him because if she does, he will go to the EEOC and say that he was retaliated against because of his wife's prior EEOC claim. Future insubordination will result in termination.

On January 16, 2008 Ray spoke in a loud and rude manner to both Tami Simpson and Tim Megard. He then stormed out of the office saying he had to go to the doctor immediately. Upon returning to work on January 20th, Tami told Ray that he would need to get a doctor[']s excuse. Ray told Tami that per [the] handbook he did not have to which is insubordination. Tami had to again tell Ray that he must get a doctor[']s excuse. After following up with the doctor's office, Tami found out that Ray never went to the doctor on the 16th. He went the following morning[,] but he got the doctor's office to write an excuse beginning on the 16th. Rude speech toward your supervisor and other employees is grounds for termination. Leaving work in the middle of the day and lying about the necessity of doing so is grounds for termination. Similar behavior in the future will result in termination.

What is also apparent after the two discussions on the 15th and 16th and some follow up with other employees is that Ray talks about C1 to other employees in a very negative way. We promote a positive work environment for our employees and cannot tolerate an employee that has nothing but negative things to say. If Ray continues to talk negatively to others about C1, it will result in termination.

Ray has also discussed company matters with at least one other employee. Specifically, he discussed his wife's EEOC claim against C1 with a fellow employee. He also attempted to talk said employee into lying to help his wife win her claim.[4] Discussing company matters with unauthorized persons is prohibited by company policy. Should Ray discuss sensitive company matters with any unauthorized person again, termination will result.

(App. 323-24)

Near the end of February, Simpson received a complaint from an individual who saw several African American students returning from church with Barber and felt discriminated against because he, and other white students, had not been invited. Other students provided statements indicating that Barber extended his invitations to the entire classroom. (App. 145-48) On February 27, 2008, Simpson told Barber that, in the future, he was not to pick up students, take them to church, or socialize with them. According to C1's written policy at the time, "[r]elationships with students in the program should be kept on a professional basis. This applies to both instructors and staff." (App. 334)

On March 2, 2008, Moore observed Barber picking up and dropping off students in the church bus, and Moore reported his observations to Simpson. (App. 172-73) Barber acknowledged having driven students to church on March 2. On March 10, 2008, Barber received notice of his termination. The termination form cites the January 23 final written warning and Simpson's direction not to drive students to church.

On November 14, 2008, Barber initiated this action, alleging that he was denied the promotion to the director's position and terminated because of racial

---

[4]The warning does not name this employee but appears to be referring to Odell Jackson.

discrimination and retaliation in violation of Title VII and ACRA. C1 filed a motion for summary judgment, which the district court granted.

The district court found that Barber had presented no direct evidence of racial discrimination and analyzed his discrimination claim pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972). The district court concluded that Barber "failed to present any ground for disbelieving C1's explanation for rejecting his bid for promotion" or its basis for terminating him. The district court evaluated his retaliation claim under the *McDonnell Douglas* framework and determined that it failed for the same reasons as his discrimination-based claims. In his Amended Complaint, Barber also alleged separate retaliation claims based on allegations that he was treated differently from those who did not engage in a protected activity and based on C1's January 23 disciplinary action against him. The district court concluded that these claims also failed, specifically finding that his claim that he was disciplined in retaliation was subsumed by his wrongful termination claim. Barber appeals.

## II. Discussion

We review a district court's decision to grant summary judgment de novo. *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078 (8th Cir. 2008). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter or law." Fed. R. Civ. P. 56(a). "Although the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Wingate*, 528 F.3d at 1078-79. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Barber's claims of discrimination and retaliation are properly analyzed under the same legal framework whether brought under Title VII or ACRA. *See Burkhart v. Am. Railcar Indus., Inc.*, 603 F.3d 472, 477 (8th Cir. 2010); *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 n.3 (8th Cir. 2000). Because we agree with the district court that Barber did not present direct evidence of either discrimination or retaliation, we analyze Barber's claims under the familiar burden-shifting framework of *McDonnell Douglas*, 411 U.S. 792.[5] *See Wierman*, 638 F.3d at 993.

### A.     Racial Discrimination

Under *McDonnell Douglas*, Barber must first establish a prima facie case of discrimination. A prima facie case of discrimination requires showing that he is a member of a protected group; he was qualified for his position; he suffered an adverse employment action; and the adverse action occurred under circumstances giving rise to an inference of discrimination. *Id.* If Barber establishes a prima facie case, the burden shifts to C1 to articulate a nondiscriminatory, legitimate basis for the challenged actions. If C1 meets this burden, Barber must "produce evidence sufficient to create a genuine issue of material fact showing that [C1's] explanation is merely a pretext for unlawful discrimination." *Id.* In other words,

---

[5]Barber argues on appeal that there is direct evidence of both retaliation and discrimination, but he did not raise this argument before the district court. Barber's brief to the district court makes no reference to the existence of direct evidence and states that he does not "dispute that the familiar McDonnell Douglas burden-shifting analysis applies." (App. 230) Moreover, we do not discern any direct evidence of retaliation or discrimination.

the question is whether a "prohibited reason, rather than the proffered reason, actually motivated the employer's action." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006).

Like the district court, we assume that Barber has established a prima facie case. Our analysis therefore focuses on whether C1's proffered reasons for its actions are pretextual. "[Barber's] burden to show pretext 'merges with the ultimate burden of persuading the court that [he was] the victim of intentional discrimination.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (en banc) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)), *petition for cert. filed*, (U.S. Aug. 29, 2011) (No. 11-273); *see Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). We will examine each of the two challenged employment actions in turn.

### 1.    Failure to Promote

C1 has presented nondiscriminatory, legitimate reasons for deciding to promote Simpson over Barber. The "Hiring Decision" memo details the basis for C1's decision: Simpson had experience filling in for Morgan while he was away, both Morgan and Barber believed that C1 would lose staff if Barber were hired, and Morgan believed that Barber could be abrasive and arrogant. Morgan was also concerned about Barber's willingness and ability to put in the hours required as director. Carroll believed that Simpson responded to interview questions better and seemed to understand the business of the school in a more nuanced way. Simpson also had connections to government agencies that Carroll thought would be useful to C1. Finally, C1 considered Moore's report that Barber intended to sue the school for discrimination if he was denied the promotion. This, alongside Barber's mention of his wife's EEOC charge during his interview, led Carroll to determine that Barber was attempting to use his wife's EEOC charge to manipulate

-12-

the hiring process. C1 has met its "non-onerous" burden of demonstrating legitimate, nondiscriminatory reasons for selecting Simpson over Barber. *See Montes v. Greater Twin Cities Youth Symphonies*, 540 F.3d 852, 858 (8th Cir. 2008); *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999).

Barber argues that C1's reasons for not promoting him are pretext for racial discrimination. To show pretext, Barber "must point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove [the] defendant's articulated reasons for its actions." *Wierman*, 638 F.3d at 995 (alterations in original) (internal quotation marks omitted). Barber claims that the following evidence shows pretext: his qualifications compared to Simpson's; false and shifting explanations for C1's decision; and other instances of discrimination at C1.

### a. Qualifications

Barber argues that "[o]n every single scale that employers typically use" he "was at least equal to, and usually far superior to, Simpson." "[T]o support a finding of pretext, [Barber] must show that [C1] hired a *less* qualified applicant." *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004) (citing *Duffy v. Wolle*, 123 F.3d 1026, 1037 (8th Cir. 1997)). Barber points to his seniority at C1, his work history, especially his military service and experience in business and the transportation field, and the fact that he had a CDL. He also argues that he was generally more qualified than Simpson, pointing again to Simpson's lack of a CDL and a statement by Morgan that Barber had "superior qualifications." The fact that Barber may have been capable of filling the role of director, or that he has specific strengths as a candidate, does not show pretext. *See Pierce v. Marsh*, 859 F.2d

-13-

601, 604 (8th Cir. 1988) ("The mere existence of comparable qualifications between two applicants . . . alone does not raise an inference of racial discrimination."). Carroll determined that Barber's CDL, though an asset, was outweighed by other strengths and experiences that Simpson would bring to the position. For example, her experience filling in for the prior director when he was away, as well as connections to government agencies, favored her. Carroll also thought that Simpson's administrative experience would be more useful in the campus director position than Barber's teaching experience. Simpson and Barber had different strengths, but Barber has produced no evidence either that Carroll or Megard unlawfully discriminated in weighing their relative strengths, or that Barber possessed objectively superior qualifications. Absent discrimination, employers are free to exercise their judgment in making personnel decisions. *See Duffy*, 123 F.3d at 1038 ("Identifying those strengths that constitute the best qualified applicant is . . . a role best left to employers . . . ."); *Lidge-Myrtil v. Deere & Co.*, 49 F.3d 1308, 1311 (8th Cir. 1995); *see also Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 517 (8th Cir. 2011).

### b. C1's explanations

Barber argues that there are falsehoods in C1's explanation of its decision to promote Simpson that show that the explanation is pretext for racial discrimination. The falsity of a nondiscriminatory explanation may support a finding of pretext. *Loeb v. Best Buy Co.*, 537 F.3d 867, 873 (8th Cir. 2008). First, Barber argues C1 falsely claims it relied on Morgan's recommendation because Morgan's affidavit states that he "did not recommend one [candidate] over the other"; that he believed Barber was more qualified than Simpson; and that the number of C1 employees who "disfavored" Barber and Simpson was approximately equal. (App. 392) The only potential conflict between Morgan's affidavit and the memos prepared by Carroll is the statement that Morgan did not recommend either candidate. Like the district court, we conclude that even

-14-

assuming Morgan did not specifically recommend Simpson, Carroll and Megard could reasonably have concluded that Morgan supported Simpson based on the information that Morgan provided. Morgan's statements about Barber's qualifications and the number of individuals who "disfavored" Simpson and Barber are not contradicted by either of the memos prepared by Carroll. Therefore, to the extent Morgan's affidavit is not a perfect mirror of Carroll's memos, this does not demonstrate pretext.

Barber also argues that Carroll's determination that Simpson had a greater understanding of the business than Barber shows pretext. Barber offers no evidence that this was not Carroll's impression following the interview; Barber has not demonstrated pretext on this basis. *Cf. Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-86 (8th Cir. 2002) ("Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices. Federal courts do not sit as 'super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.'" (quoting *Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir. 2001))); *see also Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1082 (8th Cir. 2010) ("[E]ven if [the employer's] overall assessment of [the employee] was incorrect, this does not entitle [the employee] to a judgment on the pretext issue, particularly because there is no evidence that [the employer's] assessment of [the employee] was not honest." (citing *Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 862, 869 (8th Cir. 2009))).

According to Barber, C1 wrongfully states that he brought up his wife's charge "unsolicited" during his interview. In the "Hiring Decision" memo, Carroll stated that Barber raised his wife's EEOC charge "unprompted and on his own," a decision that Carroll believed to be manipulative. According to Barber, he raised the charge in response to a question about the most difficult situation he had

-15-

encountered at C1. That C1 considered Barber to have raised the issue "unprompted" when, in fact, he was asked a general question about his experience at C1 having nothing to do with his wife's claim is not a discrepancy sufficient to make a triable issue of pretext. *See EEOC v. Trans States Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006) (contrasting a situation with two completely different explanations for the termination, which would be evidence of pretext, with a situation where minor discrepancies appeared in a consistent explanation of why the plaintiff was fired).

Barber also argues that C1 has offered "shifting explanations" for its decision not to promote him. Pretext may be shown with evidence that the employer's reasons for the adverse action have changed substantially over time. *Loeb*, 537 F.3d at 873. Barber asserts that Megard and Carroll first claimed that they considered Barber's and Simpson's abilities to carry out past duties but, when confronted with the fact that Barber's past evaluations and disciplinary records could not be found during discovery, C1 stated that Barber's past performance as a classroom instructor "had nothing to do with the promotion decision, discipline, or discharge." (App. 586) Megard and Carroll testified that they considered each candidate's past experience but not the candidate's performance evaluations. In an e-mail explaining that C1 had no documentation of any performance evaluations for Barber, C1's attorney stated that "[i]n any event, Barber's performance as a classroom instructor is not, and never was, an issue in this case," and that "[i]t had nothing to do with the promotion decision, discipline, or discharge." On this record, we detect no discrepancy that would create a triable issue as to pretext. *See Trans States Airlines*, 462 F.3d at 995.

c. Other instances

Barber argues that other instances of discrimination at C1 support a finding that C1's explanation was pretextual. Though he characterizes this argument as one based on "other instances of discrimination," he argues primarily about the lack of investigation into his own claim of discrimination and a discrimination claim by Moore. "The appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009) (citing *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 859 (8th Cir. 2004)). Moore was discharged on January 20, 2009. Subsequently, Moore alleged that his termination for misconduct was discriminatory. As proof of discrimination, Moore listed incidents of misconduct by other employees who were not subsequently fired. Barber alleges that C1 did not investigate Moore's charge of discrimination in contravention of its own written policy. C1 submitted evidence of its investigation to the district court. An employer "can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so." *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1036 (8th Cir. 2005) (internal quotation marks omitted). In the case of Moore's allegations, Barber has failed to show either that C1 did not investigate or that any deficiency of investigation was related to unlawful discrimination. The fact that Moore claims he was discriminated against is "not on point" and fails to demonstrate pretext. *See Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 480 (8th Cir. 2004).

We conclude that Barber has neither provided sufficient evidence to undermine C1's reasons for promoting Simpson over Barber nor come forward with evidence that permits a reasonable inference that racial discrimination motivated its decision. Considering both Barber's individual claims and the

cumulative effect of those claims, no reasonable jury could find pretext or discrimination, and we affirm the grant of summary judgment to C1 on Barber's claim that he was not promoted because of racial discrimination.

### 2. Termination

C1 has offered a legitimate, nondiscriminatory reason for Barber's termination. Specifically, C1 states that it terminated Barber because of repeated incidents of insubordination. After the documented incidents of insubordination on January 15 and 16, 2008, Simpson directed Barber that he should no longer transport C1 students to church. One week later, Barber, by his own admission, transported C1 students to church.[6] According to C1's notice of termination, this was the basis for Barber's termination. This is a legitimate, nondiscriminatory reason for termination. *See, e.g.*, *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) ("Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination." (internal quotation marks omitted)).

Barber claims that the following factors demonstrate that C1's explanation is pretextual: evidence of disparate treatment; Barber's treatment after Simpson's promotion; C1's allegation of a drastic decline in Barber's performance; Simpson's close supervision of Barber; C1's violation of its own practices and policies in its treatment of Barber; C1's use of false and shifting explanations to justify its

---

[6]Barber agrees that he transported students again on March 9. (App. 97) According to an e-mail from Simpson to Carroll and Megard, Simpson observed Barber driving students in his personal vehicle on March 9. (App. 142) We do not find that a material issue of fact is raised by virtue of the method of transportation, car or church bus.

decision; witness tampering and suborning perjury; the lack of African American directors at C1; and C1's subjective decision to terminate Barber.[7]

a.      Disparate treatment

Barber points to the disparate disciplinary treatment of several other employees to show pretext.  Barber identifies multiple individuals for comparison but none are similarly situated.  "To be similarly situated, 'the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" *Wierman*, 638 F.3d at 994 (quoting *Cherry*, 361 F.3d at 479).

First, Barber points to Danielle Nicole Harris.  Harris, who is white, worked in the administrative office at C1 and was accused of misconduct of a different variety than Barber—failure to complete work in a timely manner, persistent tardiness, and completing personal business at work.  Though Harris was confronted about her behavior several times before she was terminated, and she received warnings for insubordination based on her failure to timely complete filing, Barber's acts of insubordination—rude and disrespectful behavior, questioning Simpson's authority, and directly disobeying a direction—are not comparable to Harris's misconduct.  Barber has failed to show that Harris was similarly situated in all respects.  *See Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994) (employees are similarly-situated when they are "similarly

---

[7]Barber also argues that other instances of discrimination support a showing that C1's explanation of its decision to terminate him is pretext for discrimination.  We have already addressed Barber's arguments based on other instances of discrimination in the context of his failure-to-promote claim.  Barber makes no new or different arguments with respect to his termination claim, and we do not address the issue twice.

situated in all relevant respects" and "are involved in or accused of the same offense and are disciplined in different ways." (internal quotation marks omitted)).

Next, Barber argues that Simpson is an appropriately comparable employee who was treated differently. In March 2009, Simpson, who is white, was confronted about several acts of misconduct at once. Specifically, she was disciplined for hiring an employee without proof of minimum experience required by the state; allowing two employees and a former student to reside in student housing; allowing non-C1 personnel to conduct a background check on a C1 computer; and not following up on the sexual harassment claim of another employee. Based on these acts, she received a final written warning. Simpson differs from Barber in several significant respects. She accepted responsibility for her behavior, and she did not challenge the authority of the individual disciplining her. Nor did she, after being confronted about specific behavior, continue that behavior. Simpson is not an appropriate comparator for the purposes of showing pretext.

Barber also cites Ronny Ramirez, a Hispanic employee, as a comparator. Ramirez, who worked for C1 as a housekeeper in 2006, is not a comparable employee "similarly situated in all relevant respects." Barber asserts that Ramirez was fired for "repeated insubordination, sexual harassment, and poor work quality." The chief discrepancy in their treatment, according to Barber, is that Ramirez was given multiple verbal warnings before he received a written warning. The record reveals that Ramirez received one written warning for insubordination, related to working overtime, but that he did not receive multiple warnings of this kind. (App. 369, 371) Further, Ramirez was a housekeeper and the vast majority of the complaints against him were for failure to adequately clean the student dorm. To allow an inference of discrimination, the misconduct must be of comparable seriousness and the employees must be similarly situated in all relevant respects. *See EEOC v. Kohler Co.*, 335 F.3d 766, 776 (8th Cir. 2003)

("To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." (internal quotation marks omitted)). The evidence of disparately disciplined employees at C1 does not show pretext or allow an inference of discrimination.

Finally, Barber suggests that Morgan, the former director, is a comparable employee who was treated differently. Morgan, who is white, was terminated because of involvement with fraud but was later rehired. Barber appears to argue that because Morgan was ultimately rehired, he was treated more favorably than Barber. Barber has not demonstrated that he and Morgan are "similarly situated in all relevant respects." *Harvey*, 38 F.3d at 972. Indeed, they were neither involved in or accused of the same offense and there is no evidence in the record as to how, if at all, Morgan was disciplined before he was terminated. Barber failed to identify any similarly situated individuals appropriate for comparison.[8]

b.      Simpson's treatment of Barber

Barber next argues that "a series of low level incidents and mistreatment" after the promotion show pretext. For example, Simpson moved his desk from an office into a small classroom while he was on vacation; Simpson treated him with a

---

[8]Barber also suggests that two other C1 employees —Derrick Puckett and Ricky Brown—are comparable and were treated differently. C1 states that Puckett was not a C1 employee at the relevant time and that Brown was never its employee. In any case, Barber did not make this argument before the district court and "[w]e reject [Barber's] belated attempt to advance new arguments or theories not presented below." *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 915 (8th Cir. 2007); *see Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 725 (8th Cir. 2002) ("Ordinarily, we do not consider an argument raised for the first time on appeal. We consider a newly raised argument only if it is purely legal and requires no additional factual development, or if a manifest injustice would otherwise result." (citations omitted)).

"rude and sour attitude"; and Simpson assigned him do a round of drug-testing alone. Moving Barber's desk "is not materially adverse employment action because it is the kind of annoyance or petty slight that we have held does not constitute actionable harm" for the purposes of establishing a prima facie case. *Fercello*, 612 F.3d at 1078-79; *see Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 918 (8th Cir. 2007) ("Gilbert's assignment to a cubicle near a smoked glass security dome following his demotion did not constitute an adverse employment action."); *Zhuang v. Datacard Corp.*, 414 F.3d 849, 854-56 (8th Cir. 2005). We therefore conclude that the "petty slight" of moving his desk into a classroom does not show pretext. *See Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001) ("An employee's attempt to prove pretext or actual discrimination requires more substantial evidence [than required to make a prima facie case], however, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification.").

Similarly, the allegation that Simpson treated Barber with a "rude and sour attitude" does not support an inference of discriminatory animus. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("Title VII . . . does not set forth a general civility code for the American workplace." (internal quotation marks omitted)). Finally, the fact that Barber was, on one occasion, asked to complete a job usually conducted by two people, is not relevant to his termination. That Simpson once told Moore she wished she could fire Barber but that she could not do so because C1 feared a lawsuit also falls short of showing pretext. It is clear that Barber and Simpson did not get along and that Barber repeatedly invoked the EEOC and threatened to sue C1, but "personality conflicts at work that generate antipathy" are not actionable. *Id.* (quoting 1 B. Lindemann & P. Grossman, *Employment Discrimination Law* 669 (3d ed. 1996)). Moreover, there is no indication in Moore's affidavit or elsewhere that Simpson sought to terminate Barber based on race, rather than because of her documented concerns about his

-22-

behavior. Barber has not satisfied his "ultimate burden," of demonstrating he was fired because of his race.[9]

### c. Decline in performance assessment

Barber asserts that C1's explanation for his termination is essentially an allegation of a sharp decline in performance. A sharp decline in performance evaluations can be evidence of pretext. *See Davis v. Fleming Cos.*, 55 F.3d 1369, 1372-73 (8th Cir. 1995). But C1's explanation of its decision to terminate Barber was not based on a change in performance; C1 terminated Barber because he continued an activity almost immediately after being told by his director to stop, and after already having received a final warning about insubordination.

### d. Closeness of supervision

Barber alleges he was subjected to closer supervision than other employees at C1. "[A]n employer's selective investigation of an employee in a protected group can support a claim of discriminatory intent." *Wierman*, 638 F.3d at 997. To succeed in showing pretext, however, the employee "must provide some evidence that other employees were not subject to the same level of investigation for similar conduct." *Id.* at 997-98. Barber testified that during the January 15, 2008, meeting, Simpson told him she would be watching his job performance "very closely." Simpson testified that she meant she would be evaluating all

---

[9]Barber also asserts that Simpson denied him a pay raise in January 2008, despite the fact that he had recently been awarded a certificate for outstanding teaching. As he acknowledged before the district court, the decision to award the raise was "within Simpson's discretion." There is no indication in the record that the denial of the raise was a deviation from the ordinary course or that it was related to discrimination.

employees in her new supervisory position. Barber has offered no evidence either connecting this statement to a racial motive, or showing that Simpson's supervision of others was lax in comparison. Simpson's statement that she would be watching Barber closely does not, by itself, "permit a reasonable inference of discriminatory animus." *Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 643 (8th Cir. 2008) (internal quotation marks omitted).

Barber also argues that Simpson and Megard pressured C1 employees to "make false or misleading statements." According to Moore, "Tami [Simpson] was always coming around making everyone write statements about this thing that Ray [Barber] said or that thing that Ray [Barber] did. There was real pressure to write the things she wanted us to write and be supportive of the company." (App. 395) The record reflects that Simpson regularly collects witness statements to document interactions she has with C1 employees. (App. 532) Barber has not demonstrated that he received any attention that was "in any way more intensive, more frequent, or otherwise unprecedented" when compared to other employees, regardless of their race. *Wierman*, 638 F.3d at 998.

### e. C1 policies

Barber argues that C1 violated its own policies by requiring him to produce a doctor's note after he left work to go to the doctor and terminating Barber for driving students to church. C1's policy states: "If you are off work due to an illness for more than two (2) consecutive days, a note from your doctor will be required before returning to work." (App. 169) Barber's interpretation of the policy language is that an employee cannot, under any circumstances, be required to provide a doctor's note until he has been gone for two, full, consecutive days. Barber has produced no evidence that C1's interpretation or application of the policy outside this one instance prevented C1 directors from requesting a doctor's

note for shorter absences. Nor is there evidence that Simpson's motivation in requesting a doctor's note, after Barber left work on January 16, 2008, following the interaction with Simpson and Megard, was based on unlawful discrimination. *Cf. Haas*, 409 F.3d at 1036. Barber has failed to show pretext on this basis.

Barber asserts that he was unlawfully singled out for a prohibition against driving students to church, and that Simpson's directive was racially motivated. He maintains that driving students to church was common practice for C1 employees. Presumably this—his disagreement with the prohibition—is why he disregarded the prohibition. But there is no indication that other C1 employees had been the subject of similar complaints about excluded students, or that other employees were violating a supervisor's direct instruction. We agree with the district court that these circumstances do not support a reasonable inference of racial discrimination.

### f. C1's explanations

Barber argues that C1 relied on false and shifting explanations for his termination. False and shifting explanations for termination can be the basis for inferring discrimination. *See Loeb*, 537 F.3d at 873. Barber argues that there are genuine issues of fact concerning some instances of his alleged misconduct. For example, he argues that he was not insubordinate during the meeting on January 16. The "critical inquiry" is whether C1 had a good faith belief that Barber was disrespectful and insubordinate. *See Wierman*, 638 F.3d at 997; *Montes*, 540 F.3d at 858 (adverse employment action because of "attitude" legitimate and nondiscriminatory; employer's perception, not employee's actual attitude, is the relevant inquiry). Thus, the fact that Barber does not believe leaving the January 16 telephone meeting mid-meeting was insubordinate or disrespectful because he had been told he had paid time off available and no one asked him to stay does not

end the inquiry. About that meeting in particular, Simpson testified that he spoke in a "rude" tone, a "disrespectful" manner, and a "raised voice." Megard testified that Barber was "upset" and that Megard inferred his state of mind from his demeanor and "overall tone." Megard also testified that he thought it was "very disrespectful" to Simpson that Barber "stormed out" of the meeting. Barber does not dispute that he left mid-meeting, saying only that neither Simpson nor Megard told him that "he could not leave." Barber's assertions, based on Moore's affidavit, that he did not raise his voice, curse, call anyone names, or behave in a disrespectful manner do not undermine Simpson's and Megard's stated beliefs that he was disrespectful and insubordinate. Moore stated that Barber was "clearly upset."

Barber also denies several aspects of the January 15 meeting. For example, he denies telling Simpson that she should not have been promoted to the director's position, and that he could do whatever he wanted at C1 because he was protected by his wife's EEOC charge. He testified that he stated that "if I was the type of employee that really was trying to be disruptive that I believe under the law . . . a person could have the right to refuse an order from their supervisor if they believed it to be discriminatory or retaliatory." (App. 90) Simpson testified that Barber had a "raised tone" during this conversation and that "the way he talked" was "disrespectful." Under the circumstances, Barber has not shown that C1's proffered reason for his termination was false or pretextual. *Cf. Montes*, 540 F.3d at 859 ("Even assuming the board was unjustified in presenting Montes with the [Counseling] Report, there was still insufficient evidence to enable a jury to conclude Montes established his 'ultimate burden,' that he was fired because of his race or national origin.").

g.    African American directors

Barber also argues that he has "never seen an African-American Director" at C1.  As the district court noted, Barber does not provide even generic data to corroborate the assertion that is implicit in his testimony.  Barber's personal observation is not probative of pretext. *See Bogren v. Minnesota*, 236 F.3d 399, 406 (8th Cir. 2000) (disregarding plaintiff's allegation that she was the only African American female trooper ever employed by the specific patrol because "the generic type of employment statistics presented by Bogren are not probative of the reason for her termination").

h.    Subjectivity

Barber argues that the decision to terminate him was "essentially subjective, and thus, suspicious."   "We have cautioned against the use of subjective considerations because they are easily fabricated." *Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 858 (8th Cir. 2003) (citing *McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1129 (8th Cir. 1998)).  Our review of the record in this case, specifically C1's written explanation for Barber's termination, does not support the characterization that C1's decision in this case was "subjective."

i.    Post-termination litigation issues

Barber alleges that certain events that occurred in the course of this litigation show C1's racial discrimination or pretext.  We disagree.

Carroll apparently attended Barber's deposition and declined to shake Barber's hand.  Carroll explained: "He's filed a lawsuit against my company.  I

-27-

don't see the need to be nice." (App. 408) In his brief, Barber asserts that Carroll had refused to shake the hands of other African American employees, including himself and Karmen Barber. In support, Barber cites only his own deposition testimony that "when black people that seem to be as intelligent as [Carroll] was, as was the case with my wife and I, [Carroll] didn't even bother to shake their hands." (App. 438) Barber also testified that he did not work with Carroll, did not know him very well, and had probably seen him "four or five times, or three or four . . . . It was very few times." We agree with the district court that this evidence does not show discrimination.

Odell Jackson, a C1 employee, was also deposed. He submitted a post-deposition "errata sheet" stating, "Ray [Barber] tried to get me to lie to EEOC for Karmen by telling her that a nickname that Mr. David Morgan gave me offended me. The name was a joke so I wasn't offended by that and Ray kept saying, just tell them the truth but this was the truth and I wasn't going to lie and say I was offended." (App. 585) Barber argues that the record supports an inference that Jackson submitted the errata sheet based on pressure from Simpson. This argument is speculative and does not support a denial of summary judgment. "To survive a motion for summary judgment, the nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'" *Putman*, 348 F.3d at 733-34 (alterations in original) (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)); *see also Anderson*, 477 U.S. at 249-50 (evidence that is "merely colorable, or is not significantly probative," cannot be the basis for a denial of summary judgment). More importantly, though, whether Barber (or Simpson) asked Jackson to testify a certain way is not material. Neither Jackson's errata sheet, nor other statements relied on by Barber to show witness tampering, stand between Barber and a jury trial. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

-28-

We conclude that Barber's evidence does not undermine C1's reasons for terminating him. Nor does it permit a reasonable inference that racial discrimination motivated the termination. Barber was asked to stop driving students to church. Thereafter, he drove students to church. This legitimate, nondiscriminatory basis for termination was presented to Barber at the time, to the district court at summary judgment, and on appeal. Because the proffered evidence would not support a reasonable finding of pretext or discrimination, we affirm the grant of summary judgment to C1 on Barber's claim that he was terminated because of racial discrimination.

B.    Retaliation

To state a prima facie case of retaliation, an employee must show that he engaged in protected activity; he suffered a materially adverse action that "would deter a reasonable employee from making a charge of employment discrimination"; and there is a causal connection between the protected activity and the adverse action. *Fercello*, 612 F.3d at 1077-78. Where an employee successfully states a prima facie case, the burden shifts to the employer to proffer a legitimate, non-retaliatory reason for its action. *Id.* at 1078. Then, the burden shifts back to the employee to present evidence that raises a genuine issue of material fact as to whether the defendant's proffered reason is pretextual. *Id.*

Like the district court, we assume that Barber has stated a prima facie case and focus on whether he has shown that C1's proffered reasons for its decisions not to promote him and to terminate him are pretextual. As we have explained, Barber failed to show pretext.[10] We conclude his retaliation claim was properly

_____

[10]Barber summarily argues that the short time between when Carroll and Megard heard he was "considering the possibility" of filing an EEOC charge in late

dismissed. *See Putman*, 348 F.3d at 737 (affirming dismissal of retaliatory termination claim when plaintiff failed to show that employer's nondiscriminatory reason for termination was pretextual).

As to Barber's allegations—pleaded as separate retaliation claims—that C1 retaliated against him by scrutinizing his performance and disciplining him on January 23, 2008, we agree with the district court that this claim is subsumed by his wrongful termination claim. Because Barber has failed to show that he was similarly situated to employees who he claims received preferential treatment, Barber's separate retaliation claim based on disparate treatment also fails.

III. Conclusion

The judgment of the district court is AFFIRMED.

_____

November and the promotion decision in December shows evidence of retaliatory intent. "[W]e have been hesitant to find pretext or discrimination on temporal proximity alone, and look for proximity in conjunction with other evidence." *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1114 (8th Cir. 2001) (citations omitted). C1 does not deny considering Barber's threat to sue in its decision not to promote Barber; Carroll viewed it as a manipulation of the interview process. Barber asserts that the decision to hire Simpson was made (according to Moore) even before Barber mentioned the possibility of filing an EEOC claim. We determine that the proximity of the promotion decision to Barber's statement that he would file an EEOC charge if not promoted is not probative of pretext.